ORIGINAL

```
 1 │ MILBERG WEISS BERSHAD
   │   HYNES & LERACH
 2 │ ALAN SCHULMAN (128661)
   │ ANITA MELEY LAING (113867)
 3 │ 600 West Broadway, Suite 1800
   │ San Diego, CA  92101
 4 │ Telephone:  619/231-1058
   │     - and -
 5 │ MARK SOLOMON (151949)
   │ 355 South Grand Avenue
 6 │ Suite 4170
   │ Los Angeles, CA  90071
 7 │ Telephone:  213/617-9007           WEISS & YOURMAN
   │     - and -                        JOSEPH H. WEISS
 8 │ ALISON M. TATTERSALL (149607)      319 Fifth Avenue
   │ 222 Kearny Street, 10th Floor      New York, NY  10016
 9 │ San Francisco, CA  94108           Telephone:  212/532-4171
   │ Telephone:  415/288-4545
10 │                                    WOLF POPPER ROSS WOLF &
   │ WEISS & YOURMAN                      JONES, L.L.P.
11 │ KEVIN J. YOURMAN (147159)          MICHAEL P. FUCHS
   │ JOSEPH D. COHEN (155601)           PATRICIA I. AVERY
12 │ 1800 Avenue of the Stars           ANDREW LENCYK
   │ Suite 1000                         845 Third Avenue
13 │ Los Angeles, CA  90067             New York, NY  10022
   │ Telephone:  310/277-1574           Telephone:  212/759-4600
14 │
   │ Co-Lead Counsel for Plaintiffs
15 │ [Additional counsel appear on signature page.]
16 │                   UNITED STATES DISTRICT COURT
17 │                 CENTRAL DISTRICT OF CALIFORNIA
18 │                        SOUTHERN DIVISION
19 │ DOLLARD McGANN; BARRY L. BRAGGER;  ) Master File No.
   │ PETER GERSHON; STEVEN COOPERMAN;   )   SACV-91-533-AHS(EEx)
20 │ WILLIAM S. ATHERTON; IRVING SCHER; )
   │ MICHAEL PATITUCCI, JR.; J. FLOYD   ) CLASS ACTION
21 │ JOHNSON; SHULMAN, ROGERS, GANDAL,  )
   │ PORDY & ECKER, P.A.; JUDITH ISAACS;) SECOND AMENDED CONSOLIDATED
22 │ VIRGINIA DAVIS; JULIE SIROTA       ) CLASS ACTION COMPLAINT FOR
   │ KARCHIN; and CHARLES FARBER, On    ) VIOLATION OF THE FEDERAL
23 │ Behalf of Themselves and All Others) SECURITIES LAWS
   │ Similarly Situated,                )
24 │                                    ) Plaintiffs Demand A
   │                         Plaintiffs, ) Trial By Jury
25 │      vs.                           )
   │                                    )
26 │ COMMUNITY PSYCHIATRIC CENTERS,     )
   │ INC., JAMES W. CONTE, RICHARD L.   )
27 │ CONTE, JAMES P. SMITH and LOREN B. )
   │ SHOOK,                             )
28 │                                    )
   │                         Defendants. )
   │                                    )
```

[Caption continued on next page.]

```
 1   In re COMMUNITY PSYCHIATRIC CENTERS )
     SECURITIES LITIGATION               )
 2   _____)
                                         )
 3   This Document Relates To:           )
                                         )
 4        ALL ACTIONS.                   )
     _____)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

1    Plaintiffs, by their undersigned attorneys, for their
2  Complaint against defendants, allege as follows:

3                      SUMMARY OF ACTION

4    1.    This is a class action on behalf of all purchasers, other
5  than defendants, of the common stock of Community Psychiatric
6  Centers ("CPC" or the "Company") between September 4, 1990 and
7  November 4, 1991 (the "Class Period").  This action arises out of
8  defendants' fraudulent scheme to inflate the price of CPC common
9  stock by misrepresenting the Company's current business condition
10  and future prospects and by falsifying CPC's reported financial
11  statements for the third and fourth quarters of fiscal 1990, the
12  full fiscal 1990 year ended November 30, 1990 and the first, second
13  and third quarters of fiscal 1991.  Defendants falsified CPC's
14  financial statements by improperly recognizing revenue on patient
15  billings, manipulating the amounts carried on CPC's books as
16  accounts receivable, and by failing to timely write-off doubtful or
17  uncollectible accounts.  The reasons CPC's financial statements
18  were materially false are set forth in the paragraphs hereafter
19  discussing the financial statements (August 31, 1990, ¶¶37-39;
20  November 30, 1990, ¶¶48-50, 54; February 28, 1991, ¶¶59-61; May 31,
21  1991, ¶¶67-71; August 31, 1991, ¶¶78-80).  The scheme unravelled
22  after CPC announced massive write-offs of its accounts receivable
23  in September and November 1991.  CPC's common stock, which traded
24  as high as $40 per share during the Class Period, fell to $12.50
25  per share after the fraudulent scheme was revealed.

26    2.    During the Class Period, CPC operated a chain of 49
27  psychiatric hospitals through the United States and in England
28  providing in-patient and outpatient treatment for adults,

1     adolescents and children with acute psychiatric, emotional,

2     addiction and behavioral disorders.  Since its founding in 1969,

3     CPC built an impressive record of growth, having never failed to

4     meet its goal of annual earnings-per-share growth of 15% or better.

5     But that record was built in an environment of liberal employee

6     benefit packages that fully insured in-patient care for mental

7     health and drug and alcohol abuse problems.  That environment began

8     to change in the U.S. in the late 1980's as psychiatric benefits

9     provided by insurance companies and other third-party payors were

10    reduced and more tightly controlled.  By the beginning of 1990 the

11    industry had substantially moved toward managed care, toughening

12    hospital admission standards, shortening hospital stays and

13    insisting on larger discounts for in-patient treatment.

14        3.   Partly as a result of these pressures, in the first half

15    of fiscal 1990 CPC's patient admissions and patient days were down

16    in comparison to prior periods, and CPC's stock price declined as

17    well.  Defendants were determined to find a way to boost CPC's

18    stock price, in part, to pay for CPC's planned acquisition of

19    Charter Medical or "Charter."  Therefore, defendants repeatedly

20    assured the market, beginning in mid-1990, that CPC had a business

21    strategy to ensure continued growth and profitability in this

22    increasingly difficult and competitive environment as the lowest-

23    cost, highest-margin provider of inpatient psychiatric care, and

24    would continue to report 15% quarterly and annual earnings growth

25    in fiscal 1991 and beyond.

26        4.   In order to maintain the illusion of profitability and

27    growth and conceal the adverse impact of the changing business

28    climate, beginning in mid-1990 and continuing throughout the Class

- 3 -

1    Period defendants implemented a scheme to defraud the investing

2    public by materially overstating CPC's publicly reported revenues

3    and earnings.  To maintain the illusion of high patient volume and

4    growing demand for its psychiatric services, CPC began granting

5    more frequent and larger discounts to patients and third-party

6    payors and admitting lower-paying and no-pay patients at its

7    hospitals.  CPC hospitals also routinely waived patient payment

8    obligations, such as co-insurance, co-payments and deductibles, and

9    accepted patients on an "insurance only" or insurance as payment in

10   full basis, (known as "administrative allowances"), in order to

11   inflate CPC's admissions and patient days figures -- key indicators

12   which defendants knew were monitored by securities analysts.  To

13   maintain the illusion of profitability CPC failed to timely write-

14   off doubtful or uncollectible accounts and failed to deduct

15   discounts and allowances from gross revenues at the time of

16   billing, as required by applicable accounting standards, and,

17   instead, routinely booked the gross charges as revenue and carried

18   these uncollectible discounts and allowances on the books as

19   valuable accounts receivable.  In addition, CPC hospitals engaged

20   in a variety of other improper and unconscionable practices to

21   inflate revenues and earnings, including paying bounties for

22   patient referrals and buying patients from referral agencies and

23   "800 numbers," overcharging, billing for services which were not

24   provided or not medically necessary, and manipulating and

25   falsifying medical records to obtain and maximize reimbursement and

26   maximize patient length of stay.

27        5.  As a result of the defendants' stream of positive

28   statements, the apparent growth in profits and earnings-per-share

- 4 -

that CPC reported, and defendants' forecasts of continued earnings growth of 15% in fiscal 1991 and beyond, CPC's stock was a strong performer during the Class Period. Beginning in September 1990, following defendant James Conte's forecast, published in Barron's, that CPC would earn $1.80 per share in fiscal 1990 and $2.10 per share in fiscal 1991 and the Company's announcement of a successful fiscal third quarter later that month, CPC stock advanced sharply in price. After CPC announced in late January 1991 its impressive results for the fiscal year ended November 30, 1990, the price of CPC stock reached a Class Period high of $40 per share.

6. With its stock price thus artificially boosted to a 34-week high, CPC launched an attempt to acquire its troubled competitor, Charter Medical, which in early 1990 had begun reporting huge losses from the write-off of bad debt and contractual allowances. Charter Medical was more than twice CPC's size and in order to complete such an ambitious acquisition defendants had to increase and/or maintain CPC's stock price to make CPC stock feasible consideration for part of the acquisition price. In order to distinguish and distance CPC from Charter's well-publicized financial difficulties, defendants misled the market that as the low cost, high-margin provider, CPC was successfully meeting its earnings projections while successfully managing its accounts receivable. When it became obvious to defendants that the write-off of bad debt and administrative allowances would cause CPC to report a decline in earnings in the second quarter of fiscal 1991, defendants deliberately reversed and reinstated more than $6 million in worthless bad debt, administrative allowances and insurance denials which had

1    previously been written-off as uncollectible, in order to create
2    the entirely false appearance that the Company had achieved another
3    profitable quarter of double-digit earnings growth.

4         7.   None of the positive statements set forth below which
5    were issued by CPC or endorsed by the defendants during the Class
6    Period were true when issued.  In truth, CPC's purported historical
7    success and prospects for continued growth in earnings during the
8    Class Period were materially dependent on improperly recognizing
9    revenues on patient billings, manipulating the amounts carried on
10   its books as accounts receivable and failing to timely write-off
11   doubtful or uncollectible accounts.  Defendants implemented the
12   scheme to mislead investors about CPC's financial performance by
13   (1) failing to record any reserve for uncollectible accounts on
14   patient accounts less than 120 days old; (2) reporting as revenue
15   amounts which CPC had agreed, by agreement with the patient
16   (administrative allowance), contract with the insurance company or
17   other third-party payor (contractual allowance) or otherwise, not
18   to collect; (3) carrying as valid accounts on CPC's books amounts
19   which were known to be uncollectible; (4) "spreading" instead of
20   writing off bad debts and administrative and contractual allowances
21   to avoid "taking the hit" to earnings; (5) reversing accounts
22   previously written off as bad debt, administrative allowances, or
23   insurance denial amounts, and reinstating them to the accounts
24   receivable despite the already serious under-reserve situation at
25   CPC's hospitals; (6) billing for services which were not
26   documented, not provided, or not medically necessary; and (7)
27   fraudulently manipulating patient medical records and falsifying
28   patient diagnosis to obtain reimbursement and maximize patient

- 6 -

stays.  Defendants employed these improper and misleading patient recruiting, accounting and revenue recognition practices in order to give the false impression that demand for CPC's services remained strong and would support defendants' repeated statements that CPC would continue to attain 15% or better earnings growth and thus artificially inflate CPC's reported earnings.  These accounting manipulations artificially inflated, by material amounts, CPC's reported revenues and earnings in the third and fourth quarters of fiscal 1990, the fiscal year 1990 ended November 30, and the first, second and third quarters of 1991.

8.   The scheme began to unravel when suddenly, on September 27, 1991, the Company announced <u>a $23 million charge against earnings for bad debts and revealed that income for the third quarter of fiscal 1991 would decline 98% and would only be $0.01 per share, compared to market expectations of $0.48 to $0.50 per share</u>.  That day, the price of CPC stock fell more than $6.50 -- an almost 27% decline -- to $17.25 per share.  This massive charge was precipitated by the refusal of the Ontario (Canada) Health Insurance Plan ("OHIP") to pay for $7 million in contested receivables, the write-off of $3 million in uncollectible receivables at its Horizon hospital in Pomona, California which it had closed, and the addition of $13 million to the general reserve for uncollectible accounts.  In addition, in October 1991, CPC engaged Ernst & Young to conduct a "detailed review" of accounts receivable.  Based on that review, the Company announced on November 4, 1991, that it would take an <u>additional</u> charge of $14 million in the fourth quarter to cover further anticipated losses in accounts receivable.  Following these revelations, CPC stock

1   fell to $12.50 per share on November 4, 1991, compared to its Class
2   Period high of $40 per share.  While investors who purchased CPC
3   stock during the Class Period have suffered damages of many
4   millions of dollars, CPC insiders pocketed more than $14 million by
5   selling 507,611 shares of their CPC stock at prices which were
6   artificially inflated by their fraudulent scheme.

7        9.   The stock charts below demonstrate the collapse of CPC's
8   stock price as the true facts about its financial performance
9   emerged, the insider selling of CPC stock by defendants at inflated
10  prices, and that the action of CPC's stock during the Class Period,
11  when compared to an index of similar stocks, was largely due to
12  Company-specific statements and facts, as opposed to industry-wide
13  factors or stock movements.



**Community Psychiatric**
**March 1990 - March 1992**
**Average Weekly Price**

Dec. 1990
Insiders sell
309,065 shares
for $ 8,972,710

Sept. - Nov. 1990
Insiders sell
198,546 shares
for $ 5,456,422

CLASS PERIOD
Sept. 4, 1990 - Nov. 4, 1991

cpcfml

- 8 -



**Community Psychiatric Centers
vs. Salomon Bros. Group
March 16, 1990 - March 31, 1992**

JURISDICTION AND VENUE

10.   This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78aa, 28 U.S.C. §1331.   The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC").

11.   Venue is proper in this district pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).   Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in

- 9 -

1   this district.  At the time this action was commenced, CPC had its

2   principal place of business in this district.

3        12.  In connection with the acts, conduct and other wrongs

4   complained of, the defendants, directly or indirectly, used the

5   means and instrumentalities of interstate commerce, the United

6   States mails and the facilities of the national securities markets.

7                          THE PARTIES

8   Plaintiffs

9        13.  Each plaintiff herein purchased shares of CPC common

10   stock during the Class Period as follows and each has been damaged

11   thereby:

| Plaintiff Stock Purchasers | Purchase Date | Shares Purchased | Price Per Share |
|---|---|---|---|
| Dollard A. McGann | 02/12/91 | 200 | 33.25 |
| Barry L. Bragger | 05/01/91<br>10/24/91 | 50<br>50 | 34.25<br>13.625 |
| Peter Gershon | 06/17/91 | 25 | 31.875 |
| Steven Cooperman | 04/30/91 | 25 | 34.375 |
| William S. Atherton | 07/18/91<br>07/18/91 | 7,600<br>2,400 | 23.125<br>20 |
| Irving Scher | 04/05/91 | 1,000 | 37.375 |
| Michael Patitucci, Jr. | 09/23/91 | 500 | 28.5 |
| James Floyd Johnson | 08/02/91 | 100 | 30 |
| Virginia Davis | 09/27/91 | 100 | 17.375 |
| Charles M. Farber | 07/15/91 | 100 | 29.125 |
| Shulman, Rogers, Gandal, Pordy and Ecker P.A. | 08/13/91<br>10/02/91 | 300<br>200 | 26.50<br>16.125 |
| Judith N. Isaacs | 09/24/91 | 300 | 23.5 |
| Julie Sirota Karchin | 02/08/91 | 500 | 31.75 |

28   Defendants

14. During the Class Period, defendant CPC maintained its principal offices in Laguna Hills, California. The Company operated a chain of 49 acute psychiatric hospitals in the United States and the United Kingdom. CPC common stock is actively traded in an efficient market on the New York Stock Exchange under the symbol "CMY."

15. a. At all relevant times, defendant James W. Conte ("J. Conte") was Chairman of the Board and Chief Executive Officer of the Company. During the Class Period J. Conte sold 145,213 shares of CPC common stock while in the possession of material adverse, non-public information regarding the Company. Because of J. Conte's position with the Company he had access to the adverse non-public information about its financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to them in connection therewith. J. Conte signed the Company's annual report on Form 10-K for the fiscal year ended November 30, 1990 and the Letter to Shareholders in the Company's 1990 Annual Report.

b. At all relevant times since December 1, 1990, defendant Richard L. Conte ("R. Conte") has been President and Chief Financial Officer of the Company. In May 1991 he became a director of the Company. Prior to December 1, 1990, he was Executive Vice President. During the Class Period R. Conte sold 107,410 shares of CPC common stock while in the possession of the material adverse, non-public information regarding the Company.

1   Because of R. Conte's position with the Company he had access to
2   the adverse non-public information about its financial condition
3   and future business prospects via access to internal corporate
4   documents, conversations and connections with other corporate
5   officers and employees, attendance at management and Board of
6   Directors' meetings and committees thereof and via reports and
7   other information provided to them in connection therewith.   R.
8   Conte signed the Company's annual report on Form 10-K for the
9   fiscal year ended November 30, 1990, and the quarterly Form 10-Q
10  reports for the quarters ended August 31, 1990, February 28, 1991
11  and May 31, 1991, and the Letter to Shareholders in the Company's
12  1990 Annual Report.

13          c.   At all relevant times, defendant James P. Smith
14  ("Smith") has been Senior Vice President, Principal Accounting
15  Officer, Treasurer and Secretary of the Company.  During the Class
16  Period Smith sold 14,735 shares of CPC common stock while in the
17  possession of the material adverse, non-public information
18  regarding the Company.  Because of defendant Smith's position with
19  the Company he had access to the adverse non-public information
20  about its financial condition and present and future business
21  prospects via access to internal corporate documents, conversations
22  and connections with other corporate officers and employees,
23  attendance at management meetings and via reports and other
24  information provided to them in connection therewith.  Smith signed
25  the Company's 1990 Form 10-K.

26          d.   At all relevant times since December 1, 1990,
27  defendant Loren B. Shook ("Shook") has been President-U.S. Hospital
28  Division.  In May 1991 he became a director of the Company.  Prior

to December 1, 1990, he was Executive Vice President.  During the Class Period Shook personally sold 142,681 shares of CPC common stock while in the possession of material adverse, non-public information regarding the Company.  Because of defendant Shook's position with the Company he had access to the adverse non-public information about its financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to them in connection therewith.

16.  Defendants J. Conte, R. Conte, Smith and Shook, sometimes referred to herein as the "Individual Defendants," are primarily liable for the misrepresentations, omissions, course of conduct, scheme, devices and artifices to defraud alleged herein.  At all times material hereto, each of the Individual Defendants was the agent of the Company, and at all times acted with the course and scope of said agency.  The Individual Defendants, by reason of their stock ownership, management position, and/or membership on the Company's Board of Directors, are also secondarily liable for the wrongs alleged herein since they were controlling persons of the Company and had the power and influence, and exercised the same, to cause CPC to engage in the illegal practices complained of herein.

17.  As officers, directors and/or controlling persons of a publicly-held company whose stock is registered with the SEC under the 1934 Act and traded on the New York Stock Exchange, the defendants had a duty to promptly disseminate accurate and truthful

- 13 -

information with respect to the Company's operations, business, products, markets, management, earnings, present and future business prospects, to correct any previously issued statements that had become untrue and to disclose any adverse trends that would materially affect the present and future financial operating results of the Company, so that the market price of the Company's stock would be based upon truthful and accurate information.

18.   The Individual Defendants also benefitted from the illegal course of conduct by selling the Company's stock at artificially inflated prices.   Each defendant had a duty to make full and complete disclosure before selling their CPC stock, which they did not do.   In fact, they sold stock in the Company owned by them at artificially inflated prices without disclosing the material adverse and non-public facts about the Company to which they were privy, despite their duty to disclose all material adverse facts or refrain from trading in the Company's stock.

19.   The Individual Defendants, because of their positions with the Company, controlled the contents of its quarterly and annual reports, press releases and presentations to securities analysts.   Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them but not the public, each of these defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations

1  which were being made were then false and misleading. As a result,

2  each of the Individual Defendants is responsible for the accuracy

3  of the public reports and releases detailed herein as "group

4  published" information and is therefore responsible and liable for

5  the representations contained therein.

6      20.  Each of the defendants is liable as a direct participant

7  in the wrongs complained of herein. The Individual Defendants'

8  actions and their scheme and course of conduct were designed to and

9  did: (1) deceive the investing public, including plaintiffs and

10  other Class members, regarding CPC's financial performance,

11  financial condition, business practices and future business and

12  earnings prospects; (2) artificially inflate the market price of

13  CPC common stock during the Class Period; (3) cause plaintiffs and

14  other members of the Class to purchase or otherwise acquire CPC

15  common stock at inflated prices; (4) permit the Individual

16  Defendants to sell large amounts of their CPC common stock at

17  inflated prices; and (5) increase the value of options to purchase

18  CPC stock owned by each of the Individual Defendants. In

19  furtherance of this scheme and course of business, defendants, and

20  each of them, took the actions as herein set forth.

21                   CPC'S INTERNAL BUDGETS, FORECASTS,
                        PLANS AND PROJECTIONS
22

23      21.  Key management tools for the Company's top executives

24  were its business plan, budget, forecast and/or projection, by

25  which the Company's top executives set performance goals for CPC

26  hospitals and then closely monitored the corporation's actual

27  performance, i.e., results of operations, compared to the planned,

28  budgeted and/or forecasted results. These plans, forecasts and

1   budgets were prepared on an annual basis and updated monthly during

2   the year, and covered each CPC hospital including CPC's hospitals

3   in the United Kingdom.  All of the Individual Defendants were aware

4   of CPC's internal plan, forecast and budget and of the internal

5   financial reports prepared and circulated, at least monthly,

6   comparing CPC's actual results to those previously planned,

7   budgeted and/or forecasted.  CPC's top executives including the

8   Individual Defendants used its internal plan, budget and forecast

9   as the purported basis for the statements they made publicly about

10  the Company's performance during the Class Period.  CPC's corporate

11  accounting office maintained the general ledger for each of the

12  hospitals.   Each month the hospitals forwarded monthly data to

13  corporate accounting and the defendants named herein regarding each

14  hospital's performance including census, payor mix, admissions,

15  length of stay, gross accounts receivable, accounts receivable

16  weeks outstanding, cash collections, suggested bad debt write-offs,

17  bad debt reserve, contractual allowance amounts, administrative

18  allowance amounts and the like.  Based in part on the negative

19  internal reports of the Company's actual business performance

20  compared to that planned, budgeted and forecasted, including the

21  monthly package received from the hospitals, the defendants knew or

22  recklessly disregarded that their positive public statements, and

23  those of securities analysts for which the Company is responsible,

24  were false and misleading when made and artificially inflated the

25  market price of CPC's stock.

26                     FRAUD-ON-THE-MARKET DOCTRINE

27      22.  The market for CPC stock is an efficient market for the

28  following reasons, among others:

1          a.   CPC met the requirements for listing, and was listed

2    on the New York Stock Exchange, a highly efficient and automated

3    market;

4          b.   as a regulated issuer, the Company filed periodic

5    public reports with the SEC;

6          c.   the Company's trading volume was substantial,

7    averaging above 300,000 shares per day during the Class Period,

8    thereby reflecting numerous trades each day; and

9          d.   the Company was followed by analysts employed by

10   brokerage firms who wrote reports which were distributed to the

11   sales force and certain customers of their respective brokerage

12   firms and which were available to the public.   Each of these

13   reports was publicly available and entered the public marketplace.

14   The brokerage firms, which issued research reports on the Company

15   during the Class Period, are identified herein.

16                      PLAINTIFF CLASS ALLEGATIONS

17        23.   Plaintiffs bring this action as a class action pursuant

18   to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of

19   all persons who purchased the common stock of CPC between

20   September 4, 1990 through November 4, 1991 (the "Class").   Excluded

21   from the Class are the defendants herein, members of the immediate

22   family of each of the Individual Defendants, any entity in which

23   any defendant has a controlling interest, and the legal represen-

24   tatives, heirs, successors or assigns of any such excluded party.

25        24.   a.   The members of the Class are so numerous that

26   joinder of all members is impracticable.   While the exact number of

27   Class members is unknown to plaintiffs at the present time, CPC has

28

1    more than 46 million shares of common stock outstanding, owned by

2    approximately 3,000 shareholders of record throughout the country.

3         b.   Plaintiffs' claims are typical of the claims of the

4    Class because plaintiffs and all the Class members sustained

5    damages which arose out of the defendants' wrongful conduct

6    complained of herein.

7         c.   Plaintiffs are representative parties who will fully

8    and adequately protect the interests of the Class members.

9    Plaintiffs have retained counsel who are experienced and competent

10   in both class action and securities litigation.  Plaintiffs have no

11   interest which is contrary to or in conflict with those of the

12   Class they seek to represent.

13        d.   A class action would be superior to all other

14   available methods for the fair and efficient adjudication of this

15   controversy.  Plaintiffs know of no difficulty to be encountered in

16   the management of this action that would preclude its maintenance

17   as a class action.

18        e.   The prosecution of separate actions by individual

19   Class members would create a risk of inconsistent and varying

20   adjudications concerning the subject of this action, which

21   adjudications could establish incompatible standards of conduct for

22   defendants under the laws alleged herein.  Further, questions of

23   law and fact common to the members of the Class predominate over

24   any questions which may affect only individual members in that

25   defendants have acted on grounds generally applicable to the entire

26   Class.  Among the questions of law and fact common to the Class

27   are:

28

1            i.   Whether the federal securities laws were

2 violated by defendants' acts as alleged herein;

3            ii.   Whether CPC's publicly disseminated statements

4 during the Class Period omitted and/or misrepresented material

5 facts;

6           iii.   Whether defendants participated in and pursued

7 the scheme and course of conduct complained of;

8           iv.   Whether defendants acted willfully or

9 recklessly in omitting and/or misrepresenting material facts or in

10 scheming to make such misstatements;

11           v.   Whether the market prices of CPC common stock

12 during the Class Period were artificially inflated due to the

13 nondisclosure and/or misrepresentations complained of herein; and

14           vi.   The extent of injuries sustained by members of

15 the Class and the appropriate measure of damages.

16                     CPC'S GUIDANCE TO SECURITIES ANALYSTS
             AND USE OF THEM AS A CONDUIT TO FEED FALSE

17              INFORMATION TO THE SECURITIES MARKETS

18     25.  Analysts employed by securities firms prepare written

19 reports and make recommendations from time to time about public

20 companies such as CPC.  In writing their reports, these analysts

21 rely in substantial part upon information provided by and state-

22 ments and reports made publicly by the Company, information

23 provided to them privately by the Company, and assurances by the

24 Company that information in the analysts' reports is not at

25 material variance from the Company's internal knowledge of its

26 operations and prospects.

27     26.  CPC's stock is followed by securities analysts employed

28 by brokerage houses which issue reports and make recommendations

concerning CPC's common stock to their clients.   CPC used its communications to analysts to assure them that CPC's business was strong, that demand was strong and growing, that the Company was successfully transitioning from a high-margin, low volume company to a low-margin, high volume company, and that the Company was on track to achieve its forecasted 15% earnings-per-share growth in fiscal 1991 and beyond.   During all relevant times defendant R. Conte was the CPC officer who principally communicated with the analysts on behalf of CPC, who reviewed and approved the analysts' reports about CPC and who conducted the quarterly conference calls with analysts for CPC.   The securities analysts following CPC, including Donaldson, Lufkin and Jenrette, Cowen & Co., Merrill, Lynch, Pierce, Fenner & Smith, The First Boston Corporation, Wertheim Schroder & Co., Inc. and Salomon Brothers, Inc., reiterated defendant R. Conte's representations in their research reports.

27.   During the Class Period, it was the Company's practice to have its top officers, particularly R. Conte, communicate regularly with securities analysts at these and other firms to discuss, among other things, the Company's prospects, its operating results, anticipated revenues and to provide detailed "guidance" to these analysts with respect to the Company's business and projected revenues and earnings.   These communications included frequent conference calls, telephone calls with individual analysts, and analyst briefings where the defendants discussed many aspects of the Company's operations and financial prospects including length of stay, patient days, patient admissions, age of accounts receivable and the like.   The defendants knew that by participating

1  in these regular, periodic communications with analysts, the
2  Company could disseminate information to the investment community
3  and investors would rely and act upon such information (i.e., make
4  purchases and sales of the Company's securities). The substance of
5  these communications were planned, reviewed, and approved by top
6  officers and management at CPC.

7      28. The information about CPC contained in the various
8  securities analysts' reports published during the Class Period was
9  obtained from or based on information obtained from defendants.
10 Copies of drafts of these reports were provided to defendants
11 before they were released and those drafts were reviewed and
12 approved by them. Defendants knew of these reports, their
13 contents, that they would be issued to members of the investing
14 public, be circulated throughout the investment community and
15 impact the trading price of CPC's common stock. Defendants
16 endorsed these reports, including the projections, forecasts and
17 statements contained therein, adopted them as their own and placed
18 their imprimatur on them. Despite their duty to do so, the defen-
19 dants failed to correct these statements by revealing the true
20 adverse information known only to them during the Class Period.

21     29. The investment community, and in turn, investors, relied
22 and acted upon the information communicated in these written
23 reports which recommended that investors purchase CPC common stock.

24                    BACKGROUND ALLEGATIONS

25     30. This action arises out of dishonest conduct by the senior
26 management of CPC to misrepresent the profitability of its business
27 by employing improper patient recruiting, accounting and revenue
28 recognition practices in order to give the false impression that

- 21 -

demand for CPC's services remained strong, its business was profitable, and that the Company would continue to report earnings growth of 15% or better in fiscal 1991 and beyond. The purpose and effect of this deceit was to artificially inflate the trading price of CPC stock throughout the Class Period, so these insiders could sell thousands of shares of their personal holdings of CPC's stock and to enable them to use the inflated stock as consideration in a bid to acquire Charter Medical, a troubled competitor.

31. Since its founding in 1969, CPC built an impressive record of growth, having never failed to meet its goal of annual earnings-per-share growth of 15% or more. That growth and success occurred in an environment of liberal employee benefit packages that encouraged workers to seek in-patient care for mental health and drug and alcohol abuse problems.

32. In the early 1980's the psychiatric hospital industry was rapidly expanding. New inpatient facilities were built and new beds for patients with psychiatric and substance abuse problems were added, in response to a number of industry conditions: states began mandating employee mental health benefits; public awareness of mental health and drug abuse problems increased during this time, and the stigma attached to obtaining treatment for these problems diminished as even respected celebrities admitted suffering from such problems and seeking treatment; and several states, including California and Texas, allowed laws to lapse which had previously regulated and limited the building of new psychiatric hospitals to areas where a need for such facilities was demonstrated.

33.   In this permissive climate, between 1980 and 1988, the number of private psychiatric beds in the United States more than doubled, from 17,157 to 42,615.   In response to this oversupply more than 50 treatment facilities closed in 1989 and 1990, and occupancy rates averaged only 50-60% nationally.   Meanwhile, the cost of treatment for psychiatric and substance abuse problems escalated rapidly, and more providers of psychiatric and substance abuse services competed for patients, particularly patients with good insurance coverage.   In response, many employers began to limit benefits for mental illness and chemical dependency.   The previously permissive environment thus began to change in the late 1980's as psychiatric benefits provided by insurance companies and other third-party payors were reduced and more tightly controlled. By the beginning of 1990 the industry moved towards managed care, toughening hospital admission standards, shortening hospital stays and larger discounts for in-patient treatment.   During this time, insurance companies, health maintenance organizations ("HMO's"), preferred provider organizations ("PPO's") and other third-party payors increasingly (1) limited the length of inpatient stays (known as patient "length of stay" or "LOS") covered by insurance; (2) required pre-authorization and precertification of patients' hospital stays before a patient's admission to the hospital, and refused to pay or significantly limited reimbursement for treatment without such preauthorization and precertification; (3) refused to pay for treatment of certain types of previously covered disorders; (4) insisted on greater discounts to CPC's standard daily rates, including both discounts as a percentage of CPC's standard daily rates, and low flat daily rates; (5) required greater support in

1  the patient medical records for the charges billed; and (6)

2  retroactively denied coverage for inpatient stays based on lack of

3  medical necessity, inadequate documentation in the patient chart

4  and the like.  Partly as a result of these pressures, in the first

5  half of fiscal 1990, CPC's patient admissions and patient days were

6  down in comparison to prior periods.

7      34.  Beginning by mid-1990 CPC sought to conceal the adverse

8  impact of the changing psychiatric climate by granting more

9  frequent and larger discounts to patients and third-party payors

10 and admitting lower-paying and nonpaying patients at its hospitals

11 to maintain the illusion of high patient volume and growing demand

12 for psychiatric services.  CPC hospitals also routinely waived

13 patient out-of-pocket amounts such as co-insurance, co-payments and

14 deductibles and accepted patients on an "insurance only" or

15 insurance as payment in full basis, in order to get these patients

16 in the door and inflate CPC's census and patient days figures, key

17 indicators which defendants knew were monitored by securities

18 analysts.  CPC hospitals during the Class Period engaged in a

19 variety of additional improper practices to conceal the adverse

20 impact of the changing climate for private psychiatric care,

21 including paying bounties for patient referrals and buying patients

22 from referral agencies and "(800)" numbers, overcharging, billing

23 for services which were not provided or not medically necessary,

24 and manipulating and falsifying patient medical records to obtain

25 and maximize reimbursement and maximize patient length of stay.

26              PLANNED ACQUISITION OF CHARTER MEDICAL

27      35.  At about this same time, one of CPC's main competitors,

28 Charter Medical, began reporting huge losses and "inaccuracies" in

1   its accounting for bad debt, contractual allowances and other

2   expenses, and the market price of its stock plummeted.  In mid-1990

3   defendants decided to try to acquire Charter Medical in order to

4   provide CPC with a vehicle to expand its operations into the

5   Northeastern United States, where the Company entirely lacked

6   facilities.  However, Charter Medical was more than twice CPC's

7   size, both in terms of the number of its hospitals and revenues,

8   and in order to complete such an ambitious acquisition, defendants

9   needed to increase and/or maintain CPC's stock price to make CPC

10   stock feasible consideration in lieu of cash.  Moreover, in order

11   for any such equity exchange offer to have credibility with

12   Charter's creditors, as well as CPC's lender, investment banks and

13   securities analysts, CPC needed to distinguish and distance itself

14   from Charter's well-publicized financial difficulties, including

15   Charter's huge multiple write-offs of patient accounts receivable

16   during 1990.  Thus, defendants repeatedly told the market that CPC

17   was different from its competitors, that it had a strong strategic

18   position as the low-cost, high margin provider and that it would

19   actually <u>benefit</u> from the increasingly more competitive market for

20   psychiatric services and the trend toward managed care.  In order

21   to prove it was different from the rest of the industry, CPC sought

22   to assure the market that it could continue to report 15% earnings

23   growth while successfully managing its accounts receivable.

24        <u>FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD</u>

25       36.  On September 4, 1990 <u>Barron's</u> published an article

26   featuring CPC's record of "84 straight quarters of year-to-year

27   gains, yearly rises of 15% or more without a break for two decades

28   running, 20%-plus returns on equity and a clinically clean balance

1  sheet."   The article noted that CPC had managed to achieve such

2  growth "in an increasingly hostile health-care environment."   The

3  article included an interview with CPC chairman, president and co-

4  founder, defendant J. Conte, who dismissed the suggestion that CPC

5  could not continue its earnings growth record.   The article states:

6          Mr. Conte is unruffled by increasing pressures to

7      reduce the costs of psychiatric care.   He points out that

8      Community boasts rates that are typically 25% to 33% less

9      than those of its rivals, a reflection of its lower

10      costs, which, in turn, he credits to operating efficiency

11      and financial strength.   Nor is he perturbed by the rise

12      of managed-care companies that set up networks of mental-

13      health treatment centers and clinics and strive to wrest

14      discounts from hospitals for their corporate clients.

15      Mr. Conte confided to Ed [Wyatt, who interviewed him for

16      the article] that Community Psychiatric will get a piece

17      of the IBM [managed care] contract noted above and its

18      lower charges are likely to bring in an increasing volume

19      of such business.

20  To reinforce his point, J. Conte "unhesitatingly offered the

21  prediction" that CPC would earn $1.80 per share in fiscal 1990 and

22  $2.10 per share in fiscal 1991.   These statements were false and

23  misleading in failing to disclose the material adverse facts set

24  forth in ¶85.   Following publication of these 1990 and 1991

25  earnings forecasts, defendant R. Conte sold 20,793 shares of CPC

26  stock in the open market at $26 per share for proceeds of $540,618

27  and defendant Shook sold 22,540 shares at $26 per share for

28  proceeds of $586,040.

37.   On September 27, 1990 defendants caused CPC to issue a press release announcing the Company's operating results for the third quarter of fiscal 1990, ended August 31, 1990.   The Company reported revenues of $94.8 million, net income of $19.7 million or $0.43 per share, which represented substantial increases in both revenues and earnings over the prior year's period.   The press release stated:

> Community   Psychiatric   Centers   today   announced earnings per share from continuing operations (exclusive of the spun-off VIVRA businesses) for the third quarter ended Aug. 31, 1990 were $0.43 compared with $0.37 for the prior year, <u>a 16 percent increase.   This marks the 85th consecutive quarter in which CMY has posted a positive   earnings   increase</u>.   Total   revenues   from continuing   operations   for   the   third   quarter   were $94,858,000 compared with $80,278,000 for the prior year, a 18 percent increase.   Net earnings from continuing operations and average shares outstanding for the third quarter were $19,737,000; and 46,360,000; respectively, compared with $16,926,000; and 46,278,000 for the prior year. . . .   Community Psychiatric Centers continues to estimate earnings per share of $1.80 for the fiscal year ending Nov. 30, 1990.

These financial results were later repeated in the quarterly report on Form 10-Q for the quarter ended August 31, 1990, filed with the SEC on October 16, 1990 (¶41).

38.   CPC's third quarter 1990 financial results, as reported in the September 27, 1990 press release, were false, materially

overstated, and in violation of Generally Accepted Accounting Principles ("GAAP"), because, among other things, CPC improperly recognized revenue on services for which the patient or third-party payor did not have an obligation to pay and/or did not have an obligation to pay at the amounts recorded on CPC's books, i.e., CPC materially understated its reserves for contractual allowances and failed to take proper charges for known administrative allowances. Furthermore, CPC failed to record timely and adequate reserves for uncollectible and doubtful accounts receivable. At August 31, 1990, CPC understated its reserves and thereby overstated its earnings before taxes by at least $10 million. Defendants engaged in a scheme throughout the Class Period to understate CPC's reserve for bad debts by failing to record any reserve on accounts receivable less that 120 days old. This practice was a violation of GAAP. GAAP requires that a reserve be established for uncollectible receivables "even though the particular receivables that are uncollectible may not be identifiable." (FASB No. 5 ¶¶22-23). Since it was inherent in CPC's receivables that not all receivables will be collectible, CPC was required under GAAP to establish an adequate reserve for potential uncollectible amounts. Moreover, CPC improperly recognized revenue by (1) reporting as revenue amounts which CPC had agreed with the patient that it would not collect; (2) fraudulently manipulating patient medical records and "charting to coverage" to obtain and maximize reimbursement; (3) billing with inadequate documentation and supporting records, billing for services rendered to patients with a falsified diagnosis and billing for services which were not provided or not medically necessary; and (4) failing to have adequate controls in

1   its business offices to control patient billing and collection.

2   Additionally, CPC manipulated its financial results by "spreading"

3   known adjustments for bad debts over future periods instead of

4   recording the adjustment in full when it was known to defendants.

5   This practice is exemplified by a memorandum from a hospital

6   administrator to the corporate controller which states, "I would

7   like to see the difference of $278,436.38 of old bad debt which

8   needs to come off the books taken over the next ten months of

9   financial statements . . . but I would like to request that we take

10  more in the months with high revenue and cut back in months of

11  lower revenue."

12      39.  CPC's receivables included millions of dollars of

13  accounts which should have been written-off or fully reserved for

14  at August 31, 1990.  CPC was composed of 49 free-standing hospitals

15  at August 31, 1990, each of which maintained its own individual

16  receivables and patient billing information.  The following are a

17  few examples of hundreds of individual accounts for which CPC

18  failed to record adequate and timely reserves:

19      a.  CPC's patient had only $2,000 remaining of his/her

20  lifetime maximum insurance benefits as of patient's admission in

21  March 1990, and no patient payments were received through August

22  1990.  Patient did not respond to any of CPC's requests for

23  payment.  However, it was not until November 1991 that his/her

24  noncovered charges of more than $23,000 were written off.

25      b.  CPC's patient was unable to pay and CPC had waived

26  the patient co-pay amount.  Insurance coverage was denied.  The

27  patient's chart indicates that CPC knew the patient had no

28  insurance coverage before the patient was discharged in August

1990, yet it was not until April and June 1991 that CPC recorded over $37,000 of administrative allowances.

      c.  CPC's patient, discharged in March 1990, was unable to pay and insurance coverage was denied.  However, CPC did not write off the uncollectible receivable balance of approximately $31,000 until July 1991.  CPC's files note that CPC wanted to discharge the patient as soon as possible "as I'm sure she cannot self pay if it should come to that."

      d.  CPC's patient was discharged in August 1989 and as of July 1990 CPC could not locate the patient for collection, yet CPC did not write off this known uncollectible receivable of more than $19,000 until November 1991.

      e.  CPC's patient was discharged in June 1990, had charges in excess of $17,000, insurance coverage was denied and CPC had waived the patient's co-pay requirement.  CPC initially wrote off the account in April 1991, then reversed this write-off as of the May 1991 financial statement, and finally rewrote-off the uncollectible receivable in November 1991.

40.  The third quarter 1990 financial results reported by CPC on September 27, 1990, were viewed positively by analysts following CPC's stock, who issued favorable, widely-disseminated reports on CPC stock.  For example:

      a.  on September 27, 1990 Wertheim Schroder & Co., Inc. issued a research report recommending purchase of CPC stock, citing the just reported increase in admissions and revenues per patient day;

      b.  on September 28, 1990 The First Boston Corporation issued a research report recommending purchase of CPC stock, citing

1   the "steady improvement in revenue, profit and patient day growth

2   trends" and "excellent earnings growth outlook" and forecasting

3   $2.10 per share earnings for fiscal 1991;

4         c.   on September 28, 1990 Oppenheimer & Co., issued a

5   favorable research report which stated:

6       <u>We project a robust November quarter</u>, with earnings

7       rising as much as 22% to $0.44 per share from $0.36.  We

8       are maintaining our full-year estimate at $1.80 per share

9       vs. $1.56 and expect earnings of $2.10 next year;

10        d.   on October 4, 1990 Salomon Brothers, Inc. issued a

11  research report recommending purchase of CPC stock, citing the

12  Company's improved third quarter trends:

13      Community Psychiatric Centers recorded third-quarter

14      earnings per share of $.43, compared with the $.37 posted

15      a year ago and above our $.42 estimate.  <u>More important,</u>

16      <u>hospital volume strengthened</u>.  Same-facility patient

17      days, after dropping for the past three quarters, rose

18      slightly.  <u>Admissions advance by 2.7% as well, more than</u>

19      <u>offsetting the 2.2% decline in average length of stay</u>.

20      <u>The shares of Community Psychiatric have been</u>

21      <u>buffeted by concerns that ebbing growth in demand would</u>

22      <u>impair earnings momentum.  The company's improved third-</u>

23      <u>period trends have eased these concerns, and we look for</u>

24      <u>even stronger comparisons in the fourth quarter</u> . . . ;

25      and

26        e.   on October 16, 1990 Dean Witter Reynolds issued a

27  favorable report, recommending purchase of CPC stock.  The report

28  stated:

We continue to believe that CMY stock is undervalued. <u>We believe that Street earnings estimates are still too low for 1991. . . . We continue to believe the company will be able to generate 15-17% annual EPS growth over the next five years.</u>

41. On October 16, 1990 the Company filed with the SEC its quarterly report on Form 10-Q for the third fiscal quarter which reported the Company's results of operations, as previously announced on September 27, 1990 and, in addition, reported the Company's balance sheet as of August 31, 1990. The Form 10-Q report was signed by defendant R. Conte. CPC's third quarter 1990 financial results and balance sheet as reported in the Form 10-Q were materially overstated for the reasons set forth in ¶¶38-39. In addition, the Form 10-Q contained an untrue statement of material fact that the information in the Form 10-Q was fairly presented. In fact, it was not fairly presented for the reasons set forth in ¶¶87-89.

42. On December 10, 1990, a negative article published in <u>Forbes</u> magazine questioned CPC's ability to continue its 15% or better earnings-per-share growth record based on the increase in managed care-type business, and the concomitant increase in pressure on LOS, margins and patient charges. The article points out that in the past CPC has never failed to meet its goal of annual earnings-per-share growth in the 15%-20% range, and states that Chairman J. Conte "<u>insists his company can preserve its margins and maintain its earnings-per-share growth</u>."

43. To further dispel any questions raised by the <u>Forbes</u> article, defendants caused CPC to issue a press release on December

10, 1990, in which CPC announced that hospital admissions and total patient days had significantly increased in the fourth quarter -- a favorable indicator that CPC would report strong earnings growth when its financial results for the fiscal year ended November 30, 1990 were reported at the end of January 1991.  CPC reported that total patient days increased 13.3% during the fourth quarter and that total admissions in new and established hospitals were up 20.5% and 11.0%, respectively, for the quarter.  These statements were false and misleading in failing to disclose that CPC was granting larger discounts and accepting lower and no-pay patients to report increased census figures, while failing to deduct discounts and allowances at the time of billing as required by GAAP.  These statements were further false and misleading in the failure to disclose CPC's material reliance on improper patient recruitment and accounting and revenue recognition practices as set forth in ¶85.

44.  Following the issuance of the December 10, 1990 press release, senior management of the Company, including defendants J. Conte and R. Conte, met with analysts and other market professionals in New York on December 10 and 11, 1990 and reiterated that CPC had just completed a very successful fourth quarter and fiscal year and reaffirmed that CPC would earn $2.10 per share in fiscal 1991.

45.  Based on information provided by CPC regarding its expected fourth quarter results and the favorable comments to analysts in New York, several analysts issued positive reports on CPC stock.  For example:

1           a.   on December 10, 1990 Cowen & Co. issued a highly

2    favorable report reiterating its "Buy" recommendation and

3    estimating a 20% plus upside in the stock price over the next 12

4    months.

5           b.   on December 12, 1990, Wertheim Schroder & Co., Inc.

6    issued a research report in which it recommended purchase of CPC

7    stock, citing the Company's renewed momentum in patient day growth

8    and CPC's launch of a national account marketing program to

9    capitalize on the Company's low-cost provider status.

10          46.  Responding to these positive statements, the market price

11   of CPC stock rose sharply during the week of December 10, 1990 to

12   close at a 20 week high of $29.375 per share.  Capitalizing on the

13   increase in the price of CPC stock which was caused by their false

14   and misleading statements, on December 13, 1990, defendant R. Conte

15   sold 76,617 shares of CPC stock for $29.38 per share for gross

16   proceeds of $2,251,007 and defendant Shook sold 120,141 shares for

17   $29.38 per share for gross proceeds of $3,529,742.

18          47.  On January 16, 1991 the Wall Street Journal published a

19   story commenting on the recent stock sales by certain insiders at

20   CPC.  The article stated:

21          At the same time that officials at Community

22     Psychiatric Centers Inc. have been talking up their stock

23     on Wall Street, they have been trimming their own

24     holdings substantially, filings with the Securities

25     Exchange Commission show.

26                          *   *   *

27     The SEC filings show that five Community Psychiatric

28     insiders, including the chairman and the president, sold

- 34 -

1    a total of 454,278 shares valued at almost $13 million in

2    November and December.  But in mid-December, company

3    officials came to New York and made favorable comments

4    about the company's prospects to analysts and money

5    managers.

6  Responding to the Wall Street Journal article, defendant J. Conte

7  publicly denied that the insider sales were indicative of any

8  financial problems for CPC.  He represented to the Los Angeles

9  Times in an article published on January 17, 1991, that the Company

10 would meet its projections of $70 million in net earnings for the

11 fiscal year ending November 30, 1990, which would be up 15% over

12 last year for continuing operations.  He said, "There is no bad

13 news we see coming."  This statement was false and misleading when

14 made in light of defendants' scheme to conceal the material adverse

15 information about CPC's operations and financial results, and CPC's

16 material reliance on improper patient recruiting, accounting and

17 revenue recognition practices, set forth in ¶85, and the fact that

18 CPC's accounts receivable were riddled with uncollectible amounts.

19    48.  On January 29, 1991, defendants caused CPC to issue a

20 press release announcing the Company's operating results for the

21 fourth quarter and year-ended November 30, 1990, which stated in

22 part:

23    Community Psychiatric Centers today announced for the

24    year ended Nov. 30, 1990, earnings per share from

25    continuing operations (exclusive of the spun-off VIVRA

26    businesses) were $1.80 compared with $1.56 for the prior

27    year, a 15 percent increase.  Total revenues, net

28    earnings and average shares outstanding for the year

1   ended Nov. 30, 1990, were $381,791,000; $83,211,000; and

2   46,355,000, compared with $330,724; $71,961,000; and

3   46,251,000 for the prior year. Earnings per share for

4   the first quarter of 1989 included $0.04 attributable to

5   a capital gain on the sale of an old hospital physical

6   plant net of a loss on the sale of a marketable security.

7   No such net equivalent gain exists for the first quarter

8   of 1990. If these unusual items were excluded from 1989

9   vs. 1990 year to date comparisons, earnings per share

10  would have been $1.80 for the fiscal 1990 year compared

11  with $1.52 for the prior year, an 18 percent increase.

12      Earnings per share for the fourth quarter ended Nov.

13  30, 1990 were $0.45 compared with $0.36 for the prior

14  year, a 25 percent increase. This marks the 86th

15  consecutive quarter in which CMY has posted a positive

16  earnings increase. Total revenues for the fourth quarter

17  were $99,610,000 compared with $80,115,000 for the prior

18  year, a 24 percent increase. Net earnings and average

19  shares outstanding for the fourth quarter were

20  $20,735,000 and 46,366,000 respectively, compared with

21  $16,450,000 and 46,337,000 for the prior year.

22  These financial results were later repeated in the report on Form

23  10-K for the year ended November 30, 1990, filed with the SEC on

24  February 28, 1991 (¶55), and CPC's 1990 Annual Report (¶54).

25      49. CPC's fourth quarter and year-end 1990 financial results

26  as reported in the January 29, 1991 press release, were false,

27  materially overstated, and in violation of GAAP in that, among

28  other reasons, CPC improperly recognized revenue on services for

- 36 -

which the patient or third-party payor did not have an obligation
to pay and/or did not have an obligation to pay for at the amounts
they were recorded in CPC's books and records, i.e., CPC materially
understated its reserves for contractual allowances and failed to
take proper charges for known administrative allowances.
Furthermore, CPC failed to record timely and adequate reserves for
uncollectible and doubtful accounts receivable.  At November 30,
1990, CPC understated its reserves and thereby overstated its
earnings before taxes by at least $15 million.  At November 30,
1990 defendants failed to record any reserve for bad debts on
receivables less than 120 days old.  CPC improperly recognized
revenue by (1) reporting as revenue amounts which CPC had agreed
with the patient that it would not collect; (2) fraudulently
manipulating patient medical records and "charting to coverage" to
obtain and maximize reimbursement; (3) billing with inadequate
documentation and supporting records, billing for services rendered
to patients with a falsified diagnosis and billing for services
which were not provided or medically necessary, and (4) failing to
have adequate controls in its business offices to control patient
billing and collection.  At November 30, 1990, CPC had in excess of
$49 million in receivables in excess of 120 days past due, while
CPC's total reserves on CPC's receivables of approximately $128
million were only $12.5 million.

     50.  CPC's receivables included millions of dollars of
accounts which should have been written off or fully reserved for
at November 30, 1990.  The following are a few examples of hundreds
of receivables at November 30, 1990 for which CPC failed to record
adequate and timely write-offs and reserves:

a.   CPC's patient had an outstanding self-pay balance in excess of $27,000 at October 1989.  No payments were received by CPC through November 1990, more than one year after the patient's discharge, yet the account was not written off until November 1991.

b.   CPC's patient, discharged in March 1989, filed bankruptcy in October 1990, and had an outstanding balance of more than $76,000 at November 1990.  Insurance coverage was denied on the outstanding balance in April 1989.  Yet, the balance was not written off CPC's books as a bad debt until November 1991.

c.   CPC's patient was discharged in September 1990.  The patient's financial file notes that there was no insurance coverage and that the patient was unable to pay.  Yet CPC did not record any write-offs or allowances on this $5,000 receivable until November 1991.

d.   CPC's patient was discharged in October 1990, insurance coverage was denied twice, the patient was unable to pay, and did not remit any funds under his/her payment plan.  However, CPC did not write off the uncollectible receivable of more than $21,000 until August 1991.

e.   CPC's patient, discharged and known to be unable to pay in November 1990, and with no insurance coverage, had a receivable of approximately $14,000 which was not written off as a bad debt until May 1991.  As part of defendants' second quarter 1991 "reversals" scheme CPC not only rebooked at May 31, 1991 the $14,000 written off earlier that month, but rebooked an additional $5,000 that had previously been recorded as an administrative allowance at December 1990.  Finally in November 1991, CPC re-wrote off the entire $19,000 patient receivable.

1      51.   The fourth quarter and year-end 1990 financial results

2    reported by CPC on January 29, 1991, were viewed positively by

3    analysts following CPC's stock who issued favorable, widely-

4    disseminated reports recommending its purchase.  For example:

5        a.   on January 30, 1991, Donaldson, Lufkin & Jenrette

6    issued a research report recommending purchase of CPC stock, citing

7    CPC's accelerating momentum of admissions growth, CPC's unique

8    position to take advantage of acquisitions, and general "blue chip"

9    characteristics;

10       b.   on January 30, 1991, Wertheim Schroder & Co., Inc.

11    issued a research report in which it recommended purchase of

12    stock, citing the Company's rise in total admissions and patient

13    days and increase in operating margins;

14       c.   on February 7, 1991, based on information provided

15    by the defendants, Cowen & Co. issued a research report

16    recommending purchase of CPC's stock, citing CPC's continuing

17    ability to offset shorter lengths of stay by increasing patient

18    admissions; and

19       d.   on February 12, 1991, Kidder, Peabody & Co., Inc.

20    issued a research report in which it reaffirmed its "Buy" rating on

21    CPC stock, citing the Company's positive patient day comparisons

22    versus earlier periods.

23      52.   On January 30, 1991 <u>The Los Angeles Times</u> (Orange County

24    Edition) discussed CPC's recently reported fourth quarter and

25    fiscal 1990 revenues and earnings in a highly positive article

26    about CPC:

27       As the company had forecast several weeks ago, the

28       fourth-quarter results were especially strong because of

an <u>increase in patient admissions</u>.   <u>CPC officials said</u> <u>that efforts to hold down prices are helping the company</u> <u>compete in an increasingly cost-conscious market</u>.

<u>The gain in hospital admissions marks a turnaround</u> <u>from the first nine months of the year, when CPC's</u> <u>admissions declined</u>.   The earlier decline reflected pressures from medical insurance companies to control health-care costs by encouraging earlier hospital discharges, health care analysts said.

Several health care analysts said <u>CPC appears to</u> <u>have boosted its market share during the fourth quarter</u> <u>by taking business from other institutions that are not</u> <u>as financially sound.  They said the company's aggressive</u> <u>marketing efforts seem to be paying off</u>.

                              *   *   *

Richard Conte, CPC's president and chief financial officer, said the company has concentrated on keeping its prices among the lowest in the industry.   This is possible, he said, because CPC has little debt and shuns expensive television advertising.

"We tend to be $100 to $200 a day cheaper than most of the other corporate chains providing psychiatric care," Conte said.

Conte acknowledged that CPC hopes to benefit from a "shakeout" in the psychiatric treatment business.  "<u>A lot</u> <u>of companies are in financial trouble and this is the</u> <u>year some will go out</u>," he predicted.

He added <u>CPC hopes to expand by acquiring some of the hospitals that come up for sale as a result of other companies folding</u>.

These statements were false and misleading in that they implied that CPC's new marketing efforts were working and benefitting the Company's financial prospects and did not disclose that CPC was granting increasingly large discounts and waiving patient co-payments and deductibles in order to increase its census and patient days figures without taking the corresponding deduction at the same time of billing in accordance with FAS 5. These statements were further misleading in failing to disclose CPC's material reliance on the improper patient recruiting and accounting and revenue recognition practices set forth in ¶85.

53. On February 1, 1991 <u>The San Francisco Chronicle</u> published an article citing reports in the Canadian press that CPC and other U.S. hospital operators were illegally recruiting Canadian patients for drug and alcohol treatment without any physician referral and without medical need. The article also quoted a short-seller newsletter, as suggesting that "aggressive patient-recruiting" by CPC may have been responsible for most of the Company's fourth-quarter earnings gain. Defendants initiated a public relations campaign to discredit these charges. Defendant R. Conte solicited the assistance of "friendly" analysts to help CPC "tell its story." Analysts at Cowen & Co. and Donald, Lufkin & Jenrette, for example, immediately issued "call reports" telling investors to ignore the story and reiterating their buy recommendations on CPC stock. In a reply published in <u>The San Francisco Chronicle</u> on February 29, 1991, R. Conte stated that CPC was the "good guy" when it came to

1  Canadian treatment, that the Canadian patients were referred by
2  physicians, and that the Canadian patients represented well below
3  1% of CPC's patients on any given day, thus falsely implying that
4  if there were any such problem with Canadian patients it was
5  immaterial to the Company's financial condition.  These statements
6  were further false and misleading in failing to disclose CPC's
7  material reliance on improper patient recruitment practices set
8  forth in ¶85.

9      54.  On or about February 28, 1991 defendants caused CPC to
10 issue its 1990 Annual Report, which included CPC's false fourth
11 quarter and year-end 1990 results and a Letter to Shareholders,
12 signed by defendants J. Conte and R. Conte, which stated:

13          1990 was a good year for Community Psychiatric
14      Centers.  Earnings per share from continuing operations
15      amounted to $1.80, up from $1.56, a 15% gain.  As stated
16      in prior reports, our goal is earnings per share growth
17      of 15% or better each year and each quarter.  The Company
18      has achieved or exceeded this goal for 21 consecutive
19      years and 83 out of 86 quarters.  These earnings gains
20      have occurred while we have consistently maintained a
21      policy of charging at the community average or less for
22      superior patient care services in the trade areas in
23      which we operate psychiatric hospitals.

24                          *  *  *

25          Much has been written, rumored or said during the
26      past twelve months about alleged problems or troubles
27      facing the U.S. psychiatric industry.  Oftentimes, the
28      problems of specific companies have been overgeneralized

as problems for all companies in our industry, including Community Psychiatric Centers.   In  short,  a  lot  of confusion and debate has been generated as to whether the entire psychiatric hospital industry is in trouble or whether it is just a few companies.

Our  industry  is  undergoing  a  "shake-out"  period wherein some of our competitors will fail or be forced to substantially reorganize for a number of complex reasons including declining utilization, high or uncontrollable costs, inability to service highly leveraged debt, media and public backlash against questionable advertising, changeover in management direction, mercenary payments to those  who  might  refer  patients  to  them,  and  high corporate overhead.

We  believe  CPC  is  uniquely  positioned  to  take advantage  of  both  its  own  strengths  and  the  current problems of our competitors.   For over twenty years we have managed to control our costs of operation while being able to keep our prices lower than our competitors. Low  corporate  overhead,  virtually  no  advertising, extremely  limited  debt  service  and  close  corporate monitoring of costs in our hospitals have all contributed to our ability to charge less than others while achieving higher profit margins.

                           *    *    *

The  Company  maintains  a  conservative  financial position  with  adequate  resources  to  carry  out  its expansion plans and make significant acquisitions in the

1    medical services field if attractive opportunities arise.

2    The ratio of equity to debt on our balance sheet is the

3    strongest in the hospital management industry. As

4    financial conditions of some of our competitors become

5    further aggravated we expect that the number of acqui-

6    sition potentials may increase. We are well positioned

7    to prosper in an increasingly more difficult industry.

8    The letter concluded: "1991 promises to be another good year."

9        55.   The fourth quarter and year-end results and balance sheet

10   reported in the 1990 Annual Report were materially overstated for

11   the reasons set forth in ¶¶49-50.   In addition, the Annual Report

12   contained an untrue statement of material fact that the financial

13   information in the Annual Report was presented in accordance with

14   GAAP.   In fact, it was not presented in accordance with GAAP for

15   the reasons set forth in ¶¶87-89.   Moreover, the statements by

16   defendants R. Conte and J. Conte about CPC's financial performance

17   in 1990 were false because of the false financial statements,

18   revenue recognition practices, and manipulation of accounts

19   receivable, and CPC's reliance on improper patient recruiting

20   practices set forth in ¶85.

21       56.   On or about February 28, 1991, defendants caused CPC to

22   file its annual report on Form 10-K with the SEC which reported the

23   Company's results of operations for the fourth quarter and year-

24   ended November 30, 1990, as previously announced on January 29,

25   1991, and, in addition, reported the Company's balance sheet as of

26   November 30, 1990.   The Form 10-K was signed by defendants J.

27   Conte, R. Conte, and Smith among others.   The fourth quarter and

28   year-end 1990 financial results and balance sheet reported in the

1    Form 10-K were materially overstated for the reasons set forth in

2    ¶¶49-50.   In addition, the Form 10-K contained an untrue statement

3    of material fact that the financial information contained in the

4    Form 10-K was presented in accordance with GAAP.   In fact, it was

5    not presented in accordance with GAAP for the reasons set forth in

6    ¶¶87-89.

7        57.   On March 11, 1991, defendants caused CPC to issue a press

8    release announcing that total patient days in its psychiatric

9    hospitals increased 12.2 percent during the first quarter, ended

10   February 28, 1991.   The press release reported that patient days in

11   established hospitals (those open more than 12 months) rose by 7.2%

12   and that total admissions and admissions in new and established

13   hospitals were up 17.2% and 9.6%, respectively, for the first

14   quarter.   These statements were false and misleading in that they

15   failed to disclose CPC's material reliance on improper patient

16   recruitment and accounting and revenue recognition practices as set

17   forth in ¶85.

18       58.   In a press release dated March 21, 1991, CPC announced

19   its proposal to acquire Charter Medical Corporation for $1.1

20   billion in cash and CPC common stock.   The next day, March 22,

21   1991, Charter Medical announced that it had rejected CPC's offer.

22   In an article published in the Wall Street Journal on March 25,

23   1991, entitled "Community Psychiatric Says It May Go To Bondholders

24   in Charter Medical Bid," defendant J. Conte complains about Charter

25   Medical's refusal to provide sensitive business information to CPC

26   and is quoted as saying:

27       Charter "seems to be saying that we want information

28       about the company only for competitive reasons," Mr.

1  Conte said.  "I don't see that a company with a 35%
2  profit margin needs to gain any competitive information
3  from a company that can't pay its debts."

4  59.  On March 28, 1991, defendants caused CPC to issue a press
5  release announcing its results of operations for the first quarter
6  of fiscal 1991, ended February 28, 1991.  The press release
7  reported that earnings-per-share were $0.46 compared with $0.41 for
8  the prior year, a 12% increase, and that earnings-per-share from
9  operations were $0.44 compared to $0.37 for the prior year, a 19%
10  increase.  Total revenues were $103 million and earnings were $21.1
11  million, which represented substantial increases in both revenues
12  and earnings over the prior year's period.  These financial results
13  were later repeated in the quarterly report on Form 10-Q for the
14  quarter ended February 28, 1991 filed with the SEC on April 15,
15  1991 (¶64).

16  60.  CPC's first quarter 1991 financial results as reported in
17  the March 28, 1991 press release were false, materially overstated,
18  and in violation of GAAP, because, among other things, CPC
19  improperly recognized revenue on services for which the patient or
20  third-party payor did not have an obligation to pay and/or did not
21  have an obligation to pay at the amounts they were recorded in
22  CPC's books and records, i.e., it materially understated its
23  reserves for contractual allowances and failed to take proper
24  charges for known administrative allowances.  Furthermore, CPC
25  failed to record timely and adequate reserves for uncollectible and
26  doubtful accounts receivable.  At February 28, 1991, CPC
27  understated its reserves and thereby overstated its receivables by
28  at least $22 million.  At February 28, 1991 defendants failed to

record any reserve for bad debts on receivables less than 120 days old. CPC improperly recognized revenue by (1) reporting as revenue amounts which CPC had agreed with the patient that it would not collect; (2) fraudulently manipulating patient medical records and "charting to coverage" to obtain and maximize reimbursement; (3) billing with inadequate documentation and supporting records, billing for services rendered to patients with a falsified diagnosis and billing for services which were not provided or medically necessary, and (4) failing to have adequate controls in its business offices to control patient billing and collection. CPC receivables continued to deteriorate from November 1990 to February 1991. However CPC's reserve for uncollectible accounts remained level at February 28, 1991, as compared with November 30, 1990, even though CPC's receivables had increased by $8 million during the February quarter. Many of CPC's hospitals had significant receivable problems as follows:

a. 70% of Horizon Hospital's $5.8 million in receivables were in excess of 120 days past due.

b. 57% of Santa Ana Hospital's $5.6 million in receivables were in excess of 120 days past due.

c. 65% of Coliseum Medical Center's $3.3 million in receivables were in excess of 120 days past due.

d. 53% of Alhambra Hospital's $10.6 million in receivables were in excess of 120 days past due.

e. 46% of Laguna Hills Hospital's $4.1 million in receivables were in excess of 120 days past due.

f. 34% of Brea Canyon Hospital's $4.4 million in receivables were in excess of 120 days past due.

61.  CPC's receivables included millions of dollars of accounts which should have been written off or fully reserved for at February 28, 1991.  The following are a few examples of hundreds of receivables for which CPC failed to record adequate and timely write-offs and reserves:

a.  CPC's patient had exhausted the maximum benefit mid-way through the patient's hospital stay.  At the time of the patient's discharge in January 1991, the hospital knew that the patient was unable to pay his/her remaining noncovered receivable of more than $15,000.  However, it was not until May 1991 that CPC recorded an administrative allowance, which was then reversed as of the May 1991 financial statements as part of the defendants' second quarter 1991 reversal scheme.  This uncollectible account was finally re-written off as bad debt in October 1991.

b.  CPC's patient was unemployed when admitted to CPC in January 1991 and had an lifetime maximum insurance benefit of $7,500.  Upon discharge the patient owed more than $18,000 that was not written off to bad debt and administrative allowance until November 1991.

c.  An indigent patient was admitted to one of CPC's hospitals in January 1991.  Administrative allowances in excess of $19,000 were not recorded until May 1991, were then reversed in June 1991 as part of reversal scheme and were finally re-written off in July 1991.

d.  CPC's patient was discharged in September 1990 with an outstanding self pay balance in excess of $12,000.  Collection comments in the patient's financial file indicate that the hospital could not locate the patient as of January 1991.  Instead of

1   recording the write-off of the receivable at that time, the
2   hospital was instructed by corporate to spread the write-off over
3   several months.

4       e.   CPC's patient was discharged in May 1989 with an
5   outstanding self pay balance in excess of $14,000.   Collection
6   comments in the patient's file indicated that the patient notified
7   CPC in February 1991 that: "we will not be able to make any more
8   payments on this account due to the fact that I am taking care of
9   my invalid brother and had to leave my job." Yet CPC did not write
10  off the account to bad debt until November 1991.

11      f.   CPC's patient's inability to pay was known upon the
12  patient's discharge in February 1991, as reflected in a letter in
13  the file, signed by the patient, which stated: "I lost my job when
14  I was in the hospital and am in dire straits financially.   I need
15  for you to take what my insurance pays.   I cannot pay the balance.
16  Dr. Barden will verify." Yet CPC did not record the write-off of
17  more than $2,000 to administrative allowance until March and May of
18  1991.   This account was then reversed per CPC instructions as of
19  the May 1991 financial statements, and was finally re-written off
20  in November 1991.

21      62.  The first quarter 1991 financial results reported by CPC
22  on March 28, 1991 were viewed positively by analysts following
23  CPC's stock, who issued favorable, widely disseminated reports on
24  CPC's stock, based on information provided by defendants.   For
25  example:

26      a.   on April 1, 1991 Wertheim Schroder & Co., Inc.
27  issued a report recommending purchase of CPC stock, citing improved
28  utilization trends;

1          b.    on April 1, 1991 Kemper Securities Group issued a
2    positive report, recommending purchase of CPC stock, and stated:
3          We continue to rate CMY a long-term buy with a mid-high
4          teens P/E multiple expected on our estimate of $2.07 for
5          FY91 and $2.38 for FY92.  Revenue growth should continue
6          to come from same-store increases in patient days . . .
7          while operating profit margins should stabilize at the
8          mid-30's%, the highest in the industry; and
9          c.    on April 5, 1991 Dillon, Read & Co. issued a
10   research report in which it forecast $2.10 earnings-per-share in
11   fiscal 1991 and recommended purchase of CPC stock:
12         General and administrative expenses rose to 24.6
13         percent of patient revenues from 23.1 percent a year ago,
14         reflecting  principally  the  expansion  activity  and
15         positioning of CMY to develop its managed care division.
16         CMY is prepared to consider fluid pricing arrangements
17         with CHAMPUS, HMOs, PPOs, and other discount insurance
18         mechanisms,  which  involve  negotiating  scaled  rates
19         equating volume of admissions with price discounting.
20         Setting  up  the  necessary  staffing,  marketing,  and
21         computer  software  without  the  benefit  of  concurrent
22         revenues  at  this  early  stage  of  development  hampered
23         margins.  Benefits should evolve in the very near future.
24   63.  On March 31, 1991 the New York Times published an article
25   discussing CPC's proposed acquisition of Charter as follows:
26         Community Psychiatric's reputation was built on such
27         penny-pinching practices.  The company, widely praised on
28         Wall Street as the psychiatric-hospital chain with the

lowest room charges and the highest profit margins, has
eschewed debt, kept its staffing lean and spent very
little on advertising.  Which is how it has managed to
increase its earnings per share by 15 percent or better
every year since it went public in 1969.  In its last
fiscal year, it earned $83.2 million on sales of $381.8
million.

Regarding the Charter acquisition, the article quoted defendant J.
Conte as stating:

>     "This is not a decision to grow at a faster clip,"
> Mr. Conte said last week in an interview . . . .  "This
> is a strategic opportunity to purchase Charter and
> correct their operating technique at a reasonable price.
> If they were not in financial trouble we would not be
> doing this."

>     Wall Street has generally applauded the move, which
> would triple Community's size, vaulting it from fourth-
> ranked to first among psychiatric hospital companies.
> Taking over Charter's 89 psychiatric centers and 12
> acute-care hospitals would give Community valuable
> economy-of-scale savings.  It would also enable Community
> to offer service contracts to more companies with offices
> nationwide.  Most of Community's hospitals are located in
> the West while Charter, a Macon, Ga., company, operates
> mainly in the East.

>     "It would be nice for national companies to have
> national coverage," said Mr. Conte, whose company
> provides in-and out-patient care.

1                              *   *   *

2              Still, merging the companies' two cultures will be

3       a challenge.  The companies could not have more disparate

4       operating styles -- which Mr. Conte says has meant the

5       difference between sickness and health.

6                              *   *   *

7       While  Community's  occupancy  rate  is  lower  than  its

8       rivals, partly because it does not advertise, its profit

9       margins  at  some  of  its  hospitals  are  as  high  as  35

10      percent, about double the competition.

11             Rivals  have  claimed  for  years  that  Community's

12      prices reflect its lower-quality care, but many analysts

13      disagree.  Mr. Conte responds to the charge by citing the

14      independent  evaluation  commissions  that  monitor  the

15      psychiatric hospital industry.  The Joint Commission on

16      Accreditation of Health Care Organizations, a private,

17      not-for-profit entity, reports that all 16 Community

18      hospitals in California pass inspection.

19      These statements were false and misleading in failing to disclose

20      CPC's material reliance on improper patient recruiting, accounting

21      and revenue recognition practices, as set forth in ¶85.  Moreover,

22      defendant J. Conte's statement regarding independent evaluations by

23      JCAHO  of  CPC's  hospitals  was  false  and  misleading  in  that

24      defendants knew CPC hospitals were routinely out of compliance with

25      the minimum standards of care required by those organizations as

26      set forth in ¶85(j).

27             64.  On April 15, 1991, defendants caused CPC to file its

28      quarterly report on Form 10-Q with the SEC which reported the

1   Company's results of operations for the first quarter of fiscal

2   1991, as previously announced on March 28, 1991, and, in addition,

3   reported the Company's balance sheet as of February 28, 1991.  The

4   Form 10-Q was signed by defendant R. Conte.  CPC's first quarter

5   1991 financial results and balance sheet reported in the Form 10-Q

6   were materially overstated for the reasons set forth in ¶¶60-61.

7   In addition, the Form 10-Q contained an untrue statement of

8   material fact that the financial information in the Form 10-Q was

9   fairly presented, when in fact it was not fairly presented for the

10  reasons set forth in ¶¶87-89.

11       65.  In an article published in the <u>Wall Street Journal</u> on

12  April 24, 1991, CPC denied reports by a short seller newsletter

13  that it was using "aggressive revenue or expense recognition

14  policies" to inflate its financial results.  The article quotes a

15  spokeswoman for the Company as stating that while the Company had

16  receivables equalling 110 days of sales at the end of February

17  1991, the problem was concentrated in California, and that two

18  full-time employees had been sent there to work on collection.  She

19  also denied that CPC had a problem relating to the recruitment of

20  Canadian patients, asserting that Canadian patients accounted for

21  less than 1% of the patient population of CPC hospitals in fiscal

22  1990.  These statements were false and/or misleading when made in

23  that defendants implied that if any such problems existed, they

24  were extremely limited and immaterial to CPC's financial condition.

25  These statements were further misleading in failing to disclose

26  CPC's reliance on improper patient recruiting and accounting and

27  revenue recognition practices set forth in ¶85.

28

1       66.  On May 8, 1991, defendant R. Conte made a presentation

2  about CPC to financial analysts at the Alex, Brown & Sons, Inc.

3  Annual Health Care Seminar in which he stated:

4      <u>Since the Company's creation in 1969, we've had steady</u>

5      <u>orderly consistent growth of 15% or better in 83 of 87</u>

6      <u>quarters in 21 out of 21 years.</u>  We expect earnings

7      <u>growth to continue and possibly accelerate in future</u>

8      <u>years</u>.  Since the founding of the company, revenues have

9      grown from $2.8 million in 1969 to over $382 million last

10     year.  During the same period, profits have gone up from

11     a quarter of a million to in excess of $83 million.

12     Earnings in 1990 were $1.80 per share, an increase of

13     15.4% over 1989.  Street estimates for 1991 are in the

14     range of $2.00 to $2.10 per share, or roughly $90 million

15     to $95 million.

16     [I]n our hospitals division <u>we charge less than others</u>

17     <u>but we earn more than others</u>.  Pre-tax operating margins

18     have historically been close to 40%.  In the past three

19     or four years, they've been more in [the] 34%, 35%, 36%

20     range.  We emphasize, we run open staff hospitals as

21     opposed to closed staff models.  The doctors prescribe

22     treatment plans for our patients and it's up to us to

23     provide the facilities and personnel and the programs to

24     carry out their orders.  <u>The doctors use our facilities</u>

25     <u>because they want to, not because they are paid to do so</u>

26     <u>or because they have to do so</u>. . . .

27     [T]he relevant unit of sale in our business is patient

28     days.  <u>Utilization data was excellent in the fourth</u>

1    quarter of 1990 and continues into 1991.   During the

2    first quarter of 1991, patient days increased 12.2% while

3    admissions were up 17.2%.   I think this needs to be

4    contrasted off and with some of the other players in the

5    industry who have been showing negative numbers for the

6    past couple of years.  We think we're out of what we call

7    the media backlash in 1990.  A lot of you that have been

8    following the stock may recall that our patient days went

9    negative in the first and second quarters of 1990.  We

10   got that turned around during the summer where they went

11   flat.  They were up nicely in the fourth quarter, and as

12   I said, continue into this year progressing nicely. . . .

13   [W]e're still looking at a 15% or better growth on

14   earnings for the year [fiscal 1991] which ought to put us

15   in the $2.07 range.

16   These statements were false and misleading when made in failing to

17   disclose CPC's material reliance on improper patient recruiting and

18   accounting and revenue recognition practices specified in ¶85.

19   Defendant R. Conte also failed to disclose that CPC during this

20   time was increasingly granting larger and larger discounts and

21   admitting lower-pay and no-pay patients to keep up the appearance

22   of volume and demand without taking the corresponding deduction

23   required by FAS 5.  Further, defendant R. Conte failed to disclose

24   that doctors at CPC hospitals were given quotas of patients to

25   refer to CPC hospitals, and that their contracts were terminated if

26   they were unable to bring in enough patients to meet their quotas.

27        67.   On July 1, 1991, defendants caused CPC to issue a press

28   release announcing its financial results for the second quarter of

fiscal 1991, ended May 31, 1991.  The Company reported revenues of $117.7 million and earnings of $26.7 million or $0.58 per share for the quarter, which represented substantial increases in both revenues and earnings over the prior year's period.  The release also stated that earnings-per-share from operations increased 17% over the prior year.

68.  CPC's second quarter 1991 reported financial results were false, materially overstated, and in violation of GAAP, because, among other things, CPC improperly recognized revenues on services for which the patient or third-party payor did not have an obligation to pay and/or did not have an obligation to pay at the amounts recorded in CPC's books, i.e., CPC materially understated its reserves for contractual allowances and failed to take proper charges for known administrative allowances.  Furthermore, CPC failed to record timely and adequate reserves for uncollectible and doubtful accounts receivable.  At May 31, 1991, CPC understated its reserves and overstated its receivables at least $30 million.  Moreover, at May 31, 1991 defendants failed to record any reserve for bad debt on receivables less than 120 days old.  CPC improperly recognized revenue by (1) reporting as revenue amounts which CPC had agreed with the patient that it would not collect; (2) fraudulently manipulating patient medical records and "charting to coverage" to obtain and maximize reimbursement; (3) billing with inadequate documentation and supporting records, billing for services rendered to patients with a falsified diagnosis and billing for services which were not provided or medically necessary, (4) failing to have adequate controls in its business offices to control patient billing and collection, and (5)

1    recording as receivables and as increase to CPC's net revenue,

2    previously written-off patient receivables.

3        69.  Defendants decreased CPC's reserve for uncollectible

4    accounts during the second quarter of 1991 to a level which was $1

5    million lower than the reserve at February 28, 1991.  Yet, CPC's

6    receivables had increased to $150 million, $13 million higher than

7    at February 1991, and its receivables in excess of 120 days past

8    due had increased to more than $52 million.  CPC's reserve for

9    uncollectible accounts was less than 8% of CPC's total receivables

10   at May 31, 1991.  CPC thus decreased its reserve for bad debts in

11   a quarter in which it had "rebooked" some $6 million of previously

12   written off receivables.

13       70.  CPC's receivables included millions of dollars of

14   accounts which should have been written-off or fully reserved at

15   May 31, 1991.  The following are a few examples of hundreds of

16   individual accounts for which CPC failed to record adequate and

17   timely reserves:

18       a.  CPC's patient, discharged in December 1989, had an

19   outstanding balance of more than $9,000 which was not written off

20   until November 1991, although the patient's financial file states:

21   "4/27/91 unable to collect, unable to get in touch with patient,

22   father, mother.  All numbers listed out of service or no longer

23   correct number.  Send to collections.  Unemployed."

24       b.  CPC's patient, discharged in January 1989, was

25   denied coverage by insurance carrier in December 1989 for exclusion

26   of benefits under contract.  Patient filed for bankruptcy in May

27   1991, yet CPC did not write off this uncollectible balance of more

28   than $39,000 until November 1991.

1      c.   CPC's patient was admitted in August 1990 and
2    discharged in September 1990.  CPC was unable to locate the patient
3    in October 1990.   The patient had utilized his/her maximum days
4    benefit, and therefore the insurance carrier denied, in April 1991,
5    charges of more than $25,000 for this inpatient stay.   CPC,
6    however, did not write off this uncollectible balance to bad debt
7    until November 1991.

8      d.   CPC's patient, discharged in March 1990, had non-
9    covered Medicare charges of more than $28,000.  CPC knew in April
10   1991 that the patient was on disability and could not pay.  Yet,
11   CPC did not write off this uncollectible receivable balance to bad
12   debt until November 1991.

13     e.   CPC's patient, discharged in August 1990, was known
14   to be unable to pay and his/her insurance denied charges of more
15   than $12,000 in March 1991.  However, CPC did not write off this
16   uncollectible receivable balance to bad debt until August 1992.

17     f.   CPC's patient, discharged in March 1991, was known
18   to be unable to pay as the patient was in jail as of April 1991,
19   and his/her insurance denied charges of more than $27,000 in May
20   1991.  Yet this uncollectible receivable balance was not written
21   off to bad debt until November 1991.

22   71.  Despite CPC's reliance on the numerous improper
23   accounting and revenue recognition practices set forth in ¶85,
24   including deliberately underreserving for doubtful receivables,
25   maintaining known uncollectible amounts on the books and failing to
26   reserve for patient accounts until they were more than 120 days
27   old, it became clear to defendants during the second quarter of
28   1991 that CPC would not be able to report 15% earnings growth as

they had repeatedly forecast.  Thus, in June 1991, senior CPC management, including the named defendants herein, instructed CPC hospitals to <u>reverse and reinstate, as if they were collectible receivables, patient accounts which had already been determined to be uncollectible at the hospital level</u>.  In a process euphemistically referred to as "dialing for dollars," hospital business managers were given specific dollar amounts by senior CPC management, which they were told to reinstate as valid receivables, out of accounts which had previously been written-off by the hospital business managers and administrators.  CPC's employees were instructed to reverse amounts which had been written off as administrative allowance, bad debt, and utilization review denials. CPC employees who expressed concern were told to "do it or else," that it was part of the Charter acquisition, that CPC's books had to look good for that quarter, and that without reversing these accounts CPC would have a flat quarter and would maybe even lose money for the first time in its history.  Administrative allowance, bad debt and/or insurance denial accounts were reversed at at least 29 CPC hospitals, and the total amount reversed was approximately $6.1 million.  The amounts defendants instructed the hospitals to reverse and thus, effectively write back on the accounting records, as if they were collectible receivables, are itemized by hospital below:

| | |
|---|---|
| Alhambra Hospital | $ 301,000 |
| Brea Canyon Hospital | 100,000 |
| Brentwood Hospital | 150,000 |
| Capital Hospital | 700,000 |
| Cedar Spring Hospital | 185,000 |
| Coliseum Medical Center | 50,000 |
| Cypress Point Hospital | 200,000 |
| Cedar Hills Hospital | 37,000 |
| Fort Lauderdale Hospital | 70,000 |

|  |  |
|---|---|
| Great Plains Hospital | 112,000 |
| Greenbriar Hospital | 50,000 |
| Horizon Hospital | 204,000 |
| Intermountain | 30,000 |
| Laguna Hills Hospital | 138,000 |
| Meadow Wood Hospital | 110,000 |
| Oak Bend Hospital | 70,000 |
| Old Orchard Hospital | 70,000 |
| Olympus View Hospital | 60,000 |
| Palm Bay Hospital | 70,000 |
| Parkwood Hospital | 900,000 |
| Rancho Lindo Hospital | 168,000 |
| Redwoods Hospital | 35,000 |
| San Juan Capestrano | 70,000 |
| Sand Hill Hospital | 119,000 |
| Santa Ana Hospital | 156,000 |
| Sierra Vista Hospital | 59,000 |
| St. Johns River Hospital | 85,000 |
| Walnut Creek Hospital | 63,000 |
| Westwood Hospital | 299,000 |

TOTAL BAD DEBTS AND ADMINISTRATIVE
ALLOWANCES REVERSED IN THE SECOND
QUARTER:                           $4,661,000

An additional approximately $1.5 million in accounts for which insurance companies had denied payment and which had been written off were reversed and reinstated on CPC's accounts receivable. The reversal of this $6.1 million in uncollectible accounts allowed CPC to report a 12% increase in earnings in the second quarter, and a 17% increase in earnings from operations, rather than a 6% decrease from earnings reported in the second quarter in the prior year. These financial statements were thus false and misleading in that they included (1) accounts for which inadequate reserves for doubtful accounts and inadequate write-offs and adjustments for uncollectible amounts had been taken; and (2) $6.1 million in uncollectible accounts which had been written-off at the hospital level as bad debt, administrative allowance and/or insurance denial accounts and were improperly and fraudulently reversed by defendants.

72.  Defendants' falsification of CPC's second quarter 1991 results worked, at least temporarily, to convince the market that CPC's ongoing operations remained strong.  While the price of CPC stock declined somewhat following the release of the second quarter results because those results were slightly below market expectations, the market continued to highly value CPC's stock and analysts continued to issue favorable reports.  Examples of these analyst reports, based on materially false information provided by defendants, include the following:

a.  on July 1, 1991, Wertheim Schroder & Co., Inc. reaffirmed its "Buy" rating on CPC stock based on the second quarter results, which it characterized as "generally in line with expectations," stating that:

While we have not yet seen the F2Q balance sheet, management suggests that receivables days outstanding were down 1.5 days to 108.6 days;

b.  on July 2, 1991, Alex, Brown & Sons, Inc. issued a research report which stated:

We believe Community Psychiatric's 2Q results were probably much better than those of most others in the industry.  Also, its 15% operating income gain is within the Company's objectives; and

c.  on July 5, 1991, J. C. Bradford & Co. reaffirmed its "Accumulate" rating on CPC stock, stating:

Community Psychiatric indicated that the second quarter's operating margins might have been higher had top management not been so focused on its proposal to acquire Charter Medical. . . .  We think that the stock market

1   has overreacted to Community Psychiatric's second quarter

2   results and consider the stock to be undervalued with or

3   without the Charter acquisition.

4       73.  On July 8, 1991, defendants caused CPC to issue a press

5   release which was intended to halt a slide in the price of CPC

6   stock that day.  The release stated:

7       We are unable to determine and are unaware of any reason

8       for today's activity in Community Psychiatric Centers

9       stock.  We continue to estimate Earnings Per Share of

10      $2.07 for fiscal 1991 which would make 1991 our 22nd

11      consecutive year of 15% or better earnings per share

12      growth.

13  These statements were false and misleading, among other reasons,

14  for failing to disclose that the results CPC had just reported for

15  the second quarter were falsely inflated by the reinstatement of

16  worthless receivables as described above, and because CPC's ability

17  to continue to report growth in earnings could only be achieved by

18  failing to take timely write-offs of accounts receivable and

19  establishing adequate reserves for allowances and bad debt.

20      74.  On July 10, 1991, Dillon, Read & Co. issued a research

21  report in which it recommended purchase of CPC stock, citing the

22  Company's 88 consecutive quarterly earnings-per-share increases,

23  and the second quarter's 15.7% increase in total admissions.  The

24  report also stated:

25      The perceived threat of receivables getting out of

26      control seems unrealistic.  We believe that management

27      has been devoting its energies to developing negotiated

28      rate business (per-diem rates, case rates, other

contracting rates) with the various third-party administrators. As a result, days in accounts receivables climbed steadily to a blended average of 114 in fiscal 1990 after holding a 96-day average for the four preceding years. Management has since offered incentives to appropriate staff members on a facility-by-facility basis and has been monitoring closely those hospitals with particularly high receivables. Days in accounts receivable of 110 in the February quarter dipped to 108.6 in the May 1991 quarter, in part as a result of the early effects of control incentives.

75. On July 12, 1991, defendants caused CPC to file its quarterly report on Form 10-Q with the SEC which reported the Company's results of operations for the second quarter of 1991, as previously announced on July 1, 1991, and, in addition, reported the Company's balance sheet as of May 31, 1991. The Form 10-Q was signed by defendant R. Conte. CPC's second quarter 1991 financial results and balance sheet reported in the Form 10-Q were materially overstated for the reasons set forth in ¶¶68-71. In addition, the Form 10-Q contained an untrue statement of material fact that the financial information in the Form 10-Q was fairly presented. In fact, it was not fairly presented for the reasons set forth in ¶¶87-89.

76. On August 9, 1991 CPC shares came under selling pressure after an analyst at Cowen & Co. reported that CPC management had indicated to her that trends in the quarter were below expectations and that, as a result, she was slightly reducing her 50 cents a share earnings estimate for the third quarter to 48 cents. The

Cowen analyst said that, based on information provided by CPC management, she was revising her $2.07 per share fiscal 1991 estimate to a range of $2.04 to $2.07 per share, or growth of between 13% and 15% over fiscal 1990's $1.80 per share.

77. In the next week analysts at Sanford Bernstein & Co., Wertheim Schroder & Co., First Boston, and Dillon, Read & Co. also reduced fiscal year 1991 earnings-per-share estimates to the range of $2.05 to $2.00. Wertheim Schroder & Co. issued a report on August 13, 1991 which stated "we do not consider these revisions as significant" and continued to recommend the stock. Dillon, Read & Co. issued a report on August 21, 1991 which reduced fiscal 1991 earnings estimates from $2.05 to $2.00 per share based on managements indications that its $2.07 projection could prove to be a tough assignment, continued to rate CPC stock "Buy."

THE SCHEME UNRAVELS

78. Finally, on September 27, 1991, CPC suddenly revealed that its earnings for the third quarter, ended August 31, 1991, would be <u>down some 98% from the Company's recent forecasts and that</u> <u>the Company had taken a $23 million charge, or $0.32 per share,</u> <u>against earnings for the quarter to cover bad debts</u>. In a press release that day, CPC said that earnings for the third quarter ended August 31, 1991 would be only $0.01 compared to $0.43 in the prior year period. The operating income of $0.33 per share (before the $0.32 charge) <u>was also significantly below the prior year's</u> <u>period and market expectations</u>. The Company disclosed that total revenues were $90.3 million, down from $94.9 million in the year-earlier period, and that total patient days and revenue per patient

1   day declined versus the third quarter of fiscal 1990.  Regarding

2   the $23 million charge for bad debts, the release stated:

3           The non-recurring charge comprises a $13 million

4       general reserve for accounts receivable and $3 million

5       for receivables related to a domestic facility which was

6       closed at the end of the third quarter.  In addition, $7

7       million of the receivables being reserved for are

8       attributable to late payments by the Canadian government

9       for care already rendered to patients.  While it is

10      anticipated that legal action will enforce payment, the

11      company is reserving for these receivables because of the

12      excessive amount of time they have been outstanding.

13  The Company also disclosed that it was engaging in an "ongoing

14  review and conversion of its financial and accounting systems to

15  enable it to respond in a more timely and effective manner to the

16  ever increasing complexities of today's reimbursement environment

17  and the informational needs of management."

18          79.  Reacting to the September 27, 1991 announcement, the

19  market price of CPC common stock plunged 27% that day (from $23.75

20  to $17.25) on trading volume of 51.8 million shares -- the most

21  actively traded stock on the New York Stock Exchange.  While the

22  price of CPC declined sharply following the September 27, 1991

23  announcement, the true adverse facts concerning CPC were not fully

24  disclosed and the market price of CPC stock continued to be

25  artificially inflated until at least after the November 4, 1991

26  announcement described below.  Despite the huge charge taken in the

27  third quarter, the September 27, 1991 press release was false in

28  creating the misleading impression that CPC had established

1   adequate reserves to cover anticipated losses in its accounts
2   receivable.   The press release was also false in creating the
3   misleading impression that $3 million was added to the general
4   reserve for accounts receivable because a hospital was closed in
5   that quarter.   In fact, the accounts receivable at the closed
6   facility, Horizon Hospital, were determined to be "out of control"
7   long before the third quarter and most, if not all, those
8   receivables should have been written-off in fiscal 1990.

9        80.   Although not publicly disclosed until November 4, 1991,
10   in late September 1991, following the September 27, 1991 press
11   release, the Company engaged Ernst & Young ("E&Y"), the Company's
12   auditor, to perform a "special review" of CPC's accounts
13   receivable, purportedly in order to evaluate the adequacy of the
14   allowance for uncollectible accounts at August 31, 1991.   During
15   the course of this review, which included only 15 of the 49
16   hospitals and took place _after_ CPC had already taken a $23 million
17   charge in the third quarter, E&Y found significant remaining
18   uncollectible patient accounts on CPC's books.   For example, E&Y
19   found accounts which contained large uncollectible amounts such as:
20   (1) accounts which contained or entirely consisted of large
21   administrative or contractual allowance amounts which had not been
22   adjusted; (2) extremely old accounts, with patient discharge dates
23   from 1989 and 1988 or older, where insurance had paid all the
24   approved amount, the patient was unable to pay, and no payment
25   activity had occurred; (3) large account balances where the stay
26   was not authorized, the patient was not covered by insurance at all
27   or lifetime maximum benefits had been exhausted; (4) accounts which
28   were previously written-off as uncollectible and then reinstated in

1   the second quarter 1991; (5) accounts where no activity had
2   occurred since mid-1989 or earlier; (6) millions of dollars in old
3   uncollectible accounts where no effort to collect payment had been
4   made, which were not written-off based on CPC "procedure" which
5   mandates that collection letters be sent before writing off
6   accounts no matter their age; (7) accounts where no payment had
7   been received and the patient's file had been lost; and (8)
8   accounts where bills for services rendered were submitted after
9   applicable billing deadlines, meaning the bills would never be
10  paid. E&Y estimated the allowance for CPC's uncollectible accounts
11  to be between $45 million and $52 million. Based on the results of
12  this review CPC and E&Y concluded that an additional general
13  reserve of $14 million was required to provide an adequate
14  allowance for bad debt.

15      81. On November 4, 1991, CPC announced an additional $14
16  million charge against earnings in the fourth quarter to cover
17  additional anticipated losses in accounts receivable. In order to
18  conceal the true nature of CPC's accounts receivable problem and
19  the fact that the significant amount of the bad debt had been on
20  the Company's books for many quarters, the press release issued on
21  November 4, 1991 falsely represented that the increase in accounts
22  receivable had occurred in the third quarter. The release stated:

23          As a result of the increase in accounts receivable
24      at the end of the third quarter the company in
25      conjunction with its independent auditors, Ernst & Young,
26      conducted a detailed review of accounts receivable during
27      the month of October. This review disclosed that the
28      significant increase in admissions (16 percent) during

the first two quarters coupled with increased volume and complexity of managed care contracts overburdened the hospitals' patient business operations resulting in a slowdown in billing and collection activity. This slowdown was responsible for the deterioration in the aging and increase in days of revenue in accounts receivable at Aug. 31, 1991. Based upon the results of this review, the company and Ernst & Young have concluded that an additional reserve of $14 million is sufficient to provide for all anticipated losses in accounts receivable at Sept. 30, 1991. This amount will be reflected in the company's fourth quarter results.

The November 4, 1991 press release was itself false to the extent it attributed the increase in accounts receivable to factors which had occurred in the third quarter.

82. In the November 4, 1991 press release the Company also disclosed that total patient days continued to decline in the fourth quarter of fiscal 1991, citing further declines in patient census, admissions and average length of stay. The release also acknowledged that the Company had tabled its acquisition plans and was taking steps to remedy impaired internal financial and accounting controls and inadequate management information systems, including establishing an internal audit department, a national accounts receivable department, and the purchase of a new computer system for billing and collections.

83. Following the November 4, 1991 announcement the price of CPC stock declined to $12.50 per share, its lowest price since

1    1984, from a high during the Class Period of $40 per share on April

2    17, 1991.

3        84.   On February 3, 1992, CPC announced that it had suffered

4    a net loss of $3,003,000 for the fourth quarter, or $.06 per share,

5    the first in its history, compared to fourth quarter earnings-per-

6    share of $.045 in the year-ago period.   CPC reported that earnings-

7    per-share for the fiscal year 1991 were $.98, compared with $2.10

8    to $2.07 per share as projected by defendants and $1.80 per share

9    reported for fiscal 1990.

10                NON-DISCLOSURE OF MATERIAL ADVERSE INFORMATION

11       85.   The foregoing positive statements in the section entitled

12   "False and Misleading Statements," about CPC's financial results

13   and condition and its future business prospects were materially

14   false and misleading when issued in that they failed to disclose

15   the following adverse facts which then existed and disclosure of

16   which was necessary to make the statements not misleading:

17             a.   that CPC's third and fourth quarter 1990, year-end

18   1990, and first, second and third quarter 1991 results of

19   operations were materially overstated in violation of GAAP due to

20   CPC's improper recognition of revenue for services which neither

21   the patient nor third-payor payors were obligated to pay, failure

22   to record adequate reserves for contractual and administrative

23   allowances, failure to record timely and adequate reserves for

24   uncollectible and doubtful accounts receivable, practice of

25   spreading known adjustments for bad debts over future periods

26   instead of recording the adjustment in full when known;

27             b.   that CPC improperly recognized revenue by (1)

28   reporting amounts which CPC had agreed with the patient that it

1 would not collect; (2) falsifying patient medical records and

2 "charting to coverage" to improperly obtain and maximize

3 reimbursement from third-parties; and (3) billing for services

4 which were not documented, not provided, or not medically

5 necessary;

6       c. that CPC's accounts receivable were out of control

7 and grossly underreserved in that CPC failed to write-off or fully

8 reserve for (1) accounts which contained or entirely consisted of

9 large administrative or contractual allowance amounts which had not

10 been adjusted, (2) extremely old accounts, with patient discharge

11 dates from 1989 and 1988 or older, where insurance had paid all of

12 the approved amount, the patient was unable to pay, and no payment

13 activity had occurred, (3) large account balances where the stay

14 was not authorized, the patient was not covered by insurance at all

15 or lifetime maximum benefits had been exhausted, (4) accounts which

16 were previously written-off as uncollectible and then reinstated,

17 (5) accounts where no activity had occurred since mid-1989 or

18 earlier, (6) old uncollectible accounts where no effort to collect

19 payment had been made, (7) accounts where no payment had been

20 received and the patient's file had been lost, and (8) accounts

21 where bills for services rendered were submitted after applicable

22 billing deadlines, meaning the bills would never be paid;

23       d. that CPC's internal financial controls were weak and

24 deficient with respect to patient billing and collection, CPC's

25 data processing system, created in 1972, was antiquated and

26 inadequate, materially impairing the Company's ability to

27 accurately and timely bill and collect for services, leading to

28 accumulation of large amounts of uncollectible accounts receivable,

1  which would have a material adverse impact on CPC's financial
2  results;

3       e.   that CPC's results for the third and fourth quarters
4  of 1990 and the first and second quarters of 1991 did not reflect
5  real earnings growth as claimed, but rather reflected improper
6  revenue recognition, "spreading" of bad debt write-offs and
7  adjustments, and failure to record adequate reserves for doubtful
8  and uncollectible accounts;

9       f.   that CPC's historical success and purported
10 prospects for continued financial growth were dependent on its
11 ability to continue to obtain patients and their health insurance
12 benefits through illegal and unconscionable business practices
13 including the payment of bounties for referral of patients,
14 (including patients from Canada), manipulation and falsification of
15 patient medical charts including falsification of patient diagnoses
16 and patient treatment records, over-billing, double-billing and
17 billing for services not provided or not medically necessary;

18      g.   that CPC's efforts to get census at any cost
19 included the routine waiver of patient co-pay and co-insurance
20 amounts, considered a fraudulent practice by third party payors and
21 insurance companies which led to reduced reimbursement by them.
22 This is the case because the patient co-payment is generally based
23 on a percentage of the gross standard daily charge, and is meant to
24 reduce insurance fraud by requiring that the patient pay part of
25 the bill.  When a hospital would routinely grant a 20% discount to
26 its standard daily charge by waiving a patient co-payment, third
27 party payors would begin to take the position that the gross charge
28 minus the routine 20% discount was the true standard daily rate and

1    would only pay for example, 80% of that amount.  Moreover, during

2    the Class Period it was illegal under certain benefit plans to

3    waive the co-insurance, deductible or co-payment portion of the

4    charges without making reasonable attempts to collect the money

5    from the patient.  For example, Medicare, CHAMPUS and OHIP all

6    prohibited the routine waiving of patient deductibles, and required

7    demonstrations of medical indigency by paystubs, financial

8    worksheets and the like.  Moreover, in 1990 Florida passed a law

9    requiring hospitals to disclose to the insurance company when a

10   deductible, co-insurance or co-payment amount was being waived.

11   Defendants were aware during the Class Period that a number of CPC

12   hospitals were in particular violation of these laws;

13           h.   that CPC paid referral fees in order to obtain

14   patients for a number of its hospitals including fees paid to

15   "(800)" numbers and referral services.  These fees varied and were

16   sometimes as high as $1500 to $2500 per patient, particularly for

17   patients with good insurance such as that provided by the Canadian

18   government, and were often contingent on the patient remaining in

19   CPC hospitals for at least a week.  These fees were often

20   misleadingly described as fees for "aftercare" services, which

21   would purportedly involve continued treatment of the patient at a

22   less intense level of care to assist in the patient's transition

23   back to their community from the hospital.  But the firms which

24   purportedly provided the "aftercare" were nothing more than

25   storefront referral operations with no therapists or other

26   capability of providing any such transitional assistance.  As an

27   additional example, certain CPC hospitals provided sexual offender

28   programs for persons convicted of child molestation and similar

1   crimes.  Plainly, patients locked in prison are unable to attend
2   such aftercare sessions.   Other ways CPC sought to disguise the
3   payment of referral fees included setting quotas for doctors and
4   terminating the doctor's contract with the hospital if the doctor
5   failed to bring in enough patients, and by labeling these payments
6   as "program director fees;"

7          i.   that CPC's admissions growth in the third and fourth
8   quarters of fiscal 1990 and the first and second quarters of fiscal
9   1991 were in fact due to CPC's granting steeper and larger
10  discounts to patients and third-party payors and admitting lower-
11  pay and no-pay patients, without taking the corresponding
12  deductions from revenue required by GAAP, which made it impossible
13  for the Company to continue to achieve quarterly and annual
14  earnings growth as projected by the Company;

15         j.   that CPC's hospitals were routinely out of
16  compliance with JCAHO requirements for minimum standards regarding
17  the quality of patient care, particularly in regards to chronic
18  under-staffing in its hospitals and violating JCAHO requirements
19  concerning maintenance of patient medical charts.  Because JCAHO
20  and other regulatory bodies usually schedule compliance visits
21  months in advance, CPC hospitals were generally able to hire
22  additional temporary nurses and medical transcriptionists in order
23  to make it appear the hospital was adequately staffed and enable
24  the hospitals to manipulate, falsify and backdate patient medical
25  charts;

26         k.   that based on information known only to defendants
27  from internal corporate data, CPC would not continue its historical

28

1  growth in earnings per share of 15% or more throughout fiscal 1991

2  as projected during the Class Period; and

3      1.  that based on information known only to defendants

4  from internal corporate data, they did not genuinely believe the

5  earnings forecasts for the first, second and third quarters of

6  fiscal 1991 and for the entire year being made for and on behalf of

7  CPC and were aware that the adverse information known to them

8  seriously undermined and contradicted those forecasts, which

9  therefore had no reasonable basis.

10     86.  The undisclosed adverse information set forth in ¶85, is

11  the type of information which, because of SEC regulations,

12  regulations of the national stock exchanges and customary business

13  practice, is expected by investors and securities analysts to be

14  disclosed and is known by corporate officials and their legal and

15  financial advisors to be the type of information which is expected

16  to be and must be disclosed.  For example:

17     a.  Under Item 303 of Regulation S-K, promulgated by the

18  SEC under the Exchange Act, there is a duty to disclose in periodic

19  reports filed with the SEC "known trends or any known demands,

20  commitments, events or uncertainties" that are reasonably likely to

21  have a material impact on a company's sales revenues, income or

22  liquidity, or cause previously reported financial information not

23  to be indicative of future operating results.  17 C.F.R.

24  §229.303(a)(1)-(3) and Instruction 3.  In addition to the periodic

25  reports required under the Exchange Act, management of a public

26  company has a duty promptly "to make full and prompt announcement

27  of material facts regarding the company's financial condition."

28  Release No. 34-8995 (October 15, 1970), 17 C.F.R. §241.8995.  The

1    SEC has repeatedly stated that the anti-fraud provisions of the
2    federal securities laws, which are intended to ensure that the
3    investing public is provided with "complete and accurate
4    information about companies whose securities are publicly traded,"
5    apply to all public statements by persons speaking on behalf of
6    publicly traded companies "that can reasonably be expected to reach
7    investors and the trading markets, whoever the intended audience."
8    Release No. 33-6504 (January 13, 1984) 3 Fed. Sec. L. Rep. (CCH)
9    ¶23,120B, at 17,095-3, 17 C.F.R. §241.20560.   The SEC has
10   emphasized that "[i]nvestors have legitimate expectations that
11   public companies are making and will continue to make prompt
12   disclosure of significant corporate developments."   Release No.
13   18271 (November 19, 1981) [1981-1982 Transfer Binder] Fed. Sec. L.
14   Rep. (CCH) ¶83,049 at 84,618;

15        b.   Under the Rules of General Application of Regulation
16   S-X of the SEC, 17 C.F.R. §210.4-01(a)(1), the principal accounting
17   regulations governing the presentation of accounting information to
18   the SEC, the SEC has stated that "[f]inancial Statements filed with
19   the Commission which are not presented in accordance with generally
20   accepted accounting principles will be presumed to be misleading or
21   inaccurate, despite footnote or other disclosures, unless the
22   Commission has otherwise provided;" and

23        c.   The New York Stock Exchange ("NYSE") Manual provides
24   that a public company listed on the NYSE "is expected to release
25   quickly to the public any news or information which might
26   reasonably be expected to materially affect the market for its
27   securities.   This is one of the most important and fundamental

28

1    purposes of the listing agreement which the company enters into

2    with the Exchange."  NYSE Manual §202.05.

3                        CPC'S FALSE FINANCIAL STATEMENTS

4        87.   In order to achieve their goal of reporting substantially

5    increased revenues and earnings during the Class Period and to

6    artificially inflate and maintain the price of CPC's stock, the

7    defendants manipulated CPC's reported revenues and earnings through

8    improper and misleading accounting practices in violation of GAAP.

9        88.   CPC's third and fourth quarter 1990 and year-ended

10   November 30, 1990 financial statements and first, second and third

11   quarter 1991 financial statements materially overstated CPC's

12   revenues, earnings, assets and shareholder's equity in violation of

13   GAAP for the following reasons, among others:

14            a.   CPC improperly recognized material amounts of

15   revenue by failing to record amounts to be received for health care

16   services at net realizable value.  GAAP requires that a provision

17   for known contractual adjustments and discounts be deducted from

18   gross service revenue at the time net service revenue is

19   recognized.  CPC materially overstated its net revenues during the

20   Class Period in violation of AICPA Audit and Accounting Guide

21   "Audits of Providers of Health Care Services," Accounting

22   Principles Board ("APB") Opinion No. 10 "Omnibus Opinion - 1966,"

23   and FASB Statement of Concepts No. 5 "Recognition and Measurement

24   in Financial Statements of Business Enterprises," and APB Statement

25   No. 4.

26            b.   CPC failed to record timely and adequate reserves

27   for uncollectible accounts receivable in violation of FASB

28   Statement No. 5 "Accounting for Contingencies," AICPA Audit and

1  Accounting Guide "Audits of Providers of Health Services" and FASB

2  Statement of Concepts No. 5.

3         c.   CPC failed to record timely and adequate expenses

4  and losses relating to its deferral of preopening costs in

5  violation of FASB Statement No. 5 "Accounting for Contingencies,"

6  and FASB Statements of Concepts Nos. 5 and 6.

7         d.   CPC failed to timely and adequately disclose the

8  loss contingency relating to its exposure associated with CPC's

9  fraudulent patient recruitment and billing practices in violation

10  of FASB Statement No. 5 "Accounting for Contingencies."

11     89.  CPC's financial statements issued during the Class Period

12  also violated the following additional provisions of GAAP, among

13  others:

14         a.   CPC's financial statements issued during the Class

15  Period failed to comply with the accounting principle of

16  reliability, which requires that reported information be reliable

17  to the extent that users can depend on it to represent the economic

18  conditions or events that it purports to represent and that such

19  information is reasonably free from error or bias.  FASB Statement

20  of Concepts No. 2 and APB Statement No. 4.

21         b.   CPC's financial statements issued during the Class

22  Period failed to comply with the accounting principle of

23  completeness which requires that financial information be complete

24  and that it validly represents the underlying events and

25  conditions.  FASB Statement of Concepts No. 2 and APB Statement No.

26  4.

27         c.   CPC's financial statements issued during the Class

28  Period failed to comply with the accounting principle of

1   conservatism, which requires that a conservative approach be taken

2   in the accounting for transactions and the early recognition of

3   unfavorable events.   FASB Statement of Concepts No. 2 and APB

4   Statement No. 4.

5        d.   CPC's financial statements issued during the Class

6   Period failed to comply with the accounting principle of

7   neutrality, which requires that there should be an absence, in

8   reported information, of bias intended to attain a predetermined

9   result.  FASB Statement of Concepts No. 2 and APB Statement No. 4.

10        e.   CPC's financial statements issued during the Class

11   Period failed to comply with the accounting principle of relevance,

12   which requires that reported information should have the capacity

13   to make a difference in a decision by helping users to form

14   predictions about the outcomes of past, present and future events.

15   FASB Statement of Concepts No. 2 and APB Statement No. 4.

16        f.   CPC's financial statements issued during the Class

17   Period failed to comply with the accounting principle that a charge

18   to income should be made if it is probable that an asset has been

19   impaired at the date of the financial statements.   FASB Statement

20   of Concepts Nos. 5 and 6.

21                          ROLE OF E&Y

22        90.   At all relevant times E&Y was engaged by CPC to provide

23   independent accounting, consulting and auditing services.   E&Y is

24   named as a defendant in connection with the same facts and wrongful

25   conduct as alleged herein in a related action captioned Dollard

26   McGann v. Ernst & Young, SACV-93-3712-AHS(EEx), which incorporates

27   the complaint in this action by reference.   E&Y rendered an

28   unqualified audit opinion on CPC's financial statements for fiscal

year ended November 30, 1990 which was included in CPC's report on Form 10-K filed with the SEC.  For the reasons set forth in detail in the complaint in the related action against E&Y, E&Y's audit opinion with respect to CPC's financial statements for the year-ended November 30, 1990 was materially false and misleading in that E&Y failed to perform its audit in conformity with Generally Accepted Auditing Standards ("GAAS") and CPC's financial statements for the year-ended November 30, 1990 were not prepared in accordance with GAAP, as represented by E&Y in its audit opinion.

91.  E&Y was also retained to perform a "Special Review" of CPC's fiscal 1991 accounts receivable as of August 31, 1991, as described in ¶80.  E&Y participated in making false statements to the market in the November 4, 1991 press release and in CPC's annual report on Form 10-K for the year ended November 30, 1991, filed with the SEC, to create the misleading impression that CPC's accounts receivable problems arose in the third quarter of fiscal 1991 when, in fact, E&Y knew that these problems existed long before the third quarter.

<u>DEFENDANTS' INSIDER SELLING</u>

92.  While CPC officials were issuing favorable statements about CPC's growth and business prospects, five insiders including the four Individual Defendants named herein sold more than 500,000 shares of CPC stock they owned for proceeds of more than $14 million to profit from the artificial inflation in the CPC stock price their fraud had created.  Notwithstanding their access to confidential information as a result of their status as directors and/or officers of the Company with a corresponding duty to disclose the adverse material facts set forth herein, certain

1  defendants, as listed below, sold or otherwise disposed of

2  significant amounts of CPC shares at artificially inflated prices

3  throughout the Class Period:

| Name | Date | # of Shares Sold | Price | Proceeds from Sale |
|------|------|------------------|-------|--------------------|
| J. Conte | 11/09/90 | 145,213 | 28.00 | $4,065,964 |
| R. Conte | 09/04/90 | 20,793 | 26.00 | $   540,618 |
|  | 12/13/90 | 76,617 | 29.38 | $2,251,007 |
|  | 12/20/90 | 2,000 | 28.00 | $    56,000 |
|  | 12/21/90 | 8,000 | 28.50 | $   228,000 |
|  |  | 107,410 |  | $3,075,625 |
| James P. Smith | 10/16/90 | 10,000 | 26.38 | $   263,800 |
|  | 12/26/90 | 4,735 | 28.88 | $   136,746 |
|  |  | 14,735 |  | $   400,546 |
| Loren B. Shook | 09/04/90 | 22,540 | 26.00 | $   586,040 |
|  | 12/13/90 | 120,141 | 29.38 | $3,529,742 |
|  |  | 142,681 |  | $4,115,782 |
| Robert L. Green[*] | 12/19/90 | 2,272 | 28.88 | $    65,615 |
|  | 12/19/90 | 49,600 | 28.75 | $1,426,000 |
|  | 12/19/90 | 45,700 | 28.00 | $1,279,000 |
|  |  | 97,572 |  | $14,429,132 |
|  | Total | 507,611 |  | $14,429,132 |

[*]At the time of his sales Robert L. Green was a director of CPC and

was formerly Chairman of the Board through 1989.

COUNT I

For Violations of §10(b) of the<br>Exchange Act and Rule 10b-5 of the SEC

22      93.  Plaintiffs incorporate by reference ¶¶1-92 as if set

23  forth fully herein.  This Count is asserted against all defendants.

24      94.  The defendants knew, or were reckless in failing to know,

25  of the material omissions from and misrepresentations contained in

26  the statements as set forth above.  Because of their Board

27  membership and/or their executive and managerial positions with

28  CPC, each of the Individual Defendants: knew or had access to the

1   material adverse non-public information about CPC's adverse

2   financial outlook and then existing business conditions, which

3   information was not disclosed; and drafted, reviewed and/or

4   approved the misleading statements, releases, reports and other

5   public representations of and about CPC.

6       95.   Throughout the Class Period, defendants, with knowledge

7   or reckless disregard for the truth, disseminated or approved

8   releases, statements and reports, referred to above, which were

9   misleading in that they contained misrepresentations and failed to

10  disclose material facts necessary in order to make the statements

11  made, in light of the circumstances under which they were made, not

12  misleading.

13      96.   During the Class Period, defendants, individually and in

14  concert, directly and indirectly, engaged and participated in a

15  continuous course of conduct and scheme to conceal adverse material

16  information regarding the financial outlook of the Company as

17  specified herein.   Defendants employed devices, schemes and

18  artifices to defraud and engaged in acts, practices and a course of

19  conduct as herein alleged to commit a fraud on the integrity of the

20  market for the Company's stock and to maintain artificially high

21  market prices for the common stock of CPC.   This included the

22  formulation, making of and/or participation in the making of,

23  untrue statements of material facts and the omission to state

24  material facts necessary in order to make the statements made, in

25  light of the circumstances under which they were made, not

26  misleading, and engaging in acts, practices and a course of conduct

27  which operated as a fraud and deceit upon plaintiffs and the Class,

28

1  all of the above in connection with the purchase of CPC common

2  stock by plaintiffs and members of the Class.

3      97. By reason of the conduct alleged herein, defendants

4  knowingly or recklessly, directly and indirectly, have violated

5  §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in

6  that they: (a) employed devices, schemes and artifices to defraud;

7  (b) made untrue statements of material facts or omitted to state

8  material facts necessary in order to make statements made, in light

9  of the circumstances under which they were made, not misleading; or

10 (c) engaged in acts, practices and a course of business that

11 operated as a fraud or deceit upon plaintiffs and others similarly

12 situated in connection with their purchases of CPC common stock

13 during the Class Period.

14     98. Plaintiffs and the Class have suffered substantial

15 damages in that, in reliance on the integrity of the market, they

16 paid artificially inflated prices for CPC common stock as a result

17 of defendants' violations of §10(b) of the Exchange Act and SEC

18 Rule 10b-5. Plaintiffs and the Class would not have purchased CPC

19 stock at the prices they paid, or at all, if they had been aware

20 that the market prices had been artificially and falsely inflated

21 by defendants' false and misleading statements. At the time of the

22 purchases by plaintiffs, and the Class, of CPC common stock, the

23 fair market value of said common stock was substantially less than

24 the prices paid by them.

25

26

27

28

## COUNT II

### For Violation Of §20(a) Of The
### Exchange Act Against The Individual Defendants

99. Plaintiffs incorporate by reference ¶¶1-98 above as if set forth fully herein. This Count is asserted against the Individual Defendants.

100. The Individual Defendants acted as controlling persons of the Company within the meaning of §20 of the Exchange Act. By reason of their positions as senior officers and/or directors, and their stock ownership, as alleged above, these defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.

101. By reason of such wrongful conduct, defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of the defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

1. Declaring this action to be a proper class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

2. Awarding plaintiffs and the members of the Class compensatory damages;

3. Awarding plaintiffs and the members of the Class, pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees and other costs;

1    4.   Awarding extraordinary equitable and/or injunctive relief

2  as permitted by law, equity and the federal statutory provisions

3  sued hereunder, pursuant to Rules 64, 65 and any appropriate state

4  law remedies including attaching, impounding, imposing a

5  constructive trust on or otherwise restricting the proceeds of

6  defendants' trading activities or their other assets to assure that

7  plaintiffs have an effective remedy; and

8    5.   Awarding such other relief as this Court may deem just

9  and proper.

10                          JURY DEMAND

11    Plaintiffs demand a trial by jury.

12  DATED:   May 5, 1995

13                          MILBERG WEISS BERSHAD
                              HYNES & LERACH
14                          ALAN SCHULMAN
                            ANITA MELEY LAING

15

16                          _Alan Schulman_
                            ALAN SCHULMAN

17

18                          600 West Broadway, Suite 1800
                            San Diego, CA  92101
                            Telephone:  619/231-1058
19                                    -and-
20                          MARK SOLOMON
                            355 South Grand Avenue
                            Suite 4170
21                          Los Angeles, CA  90071
                            Telephone:  213/617-9007
22                                    -and-
                            ALISON M. TATTERSALL
23                          222 Kearny Street, 10th Floor
                            San Francisco, CA  94108
24                          Telephone:  415/288-4545

25

26

27

28

WEISS & YOURMAN
KEVIN J. YOURMAN
JOSEPH D. COHEN

_Kevin J. Yourman_   AMT
KEVIN J. YOURMAN

1800 Avenue of the Stars
Suite 1000
Los Angeles, CA  90067
Telephone:  310/277-1574

WEISS & YOURMAN
JOSEPH H. WEISS
319 Fifth Avenue
New York, NY  10016
Telephone:  212/532-4171

WOLF POPPER ROSS WOLF
  & JONES, L.L.P.
MICHAEL P. FUCHS
PATRICIA I. AVERY
ANDREW LENCYK
845 Third Avenue
New York, NY  10022
Telephone:  212/759-4600

Co-Lead Counsel for Plaintiffs

ABBEY & ELLIS
MARK C. GARDY
212 East 39th Street
New York, NY  10016
Telephone:  212/889-3700

SKOKOS, COLEMAN &
  RAINWATER, P.A.
THEODORE C. SKOKOS
425 West Capitol Avenue
3200 TCBY Tower
Little Rock, AR  72201-3439
Telephone:  501/374-1107

BERNSTEIN LITOWITZ BERGER &
  GROSSMANN
MAX W. BERGER
1285 Avenue of the Americas
33rd Floor
New York, NY  10019
Telephone:  212/554-1400

```
 1    KAUFMAN, MALCHMAN, KIRBY
        & SQUIRE
 2    JEFFREY H. SQUIRE
      919 Third Avenue, 11th Floor
 3    New York, NY  10022
      Telephone:  212/371-6600
 4
      BERGER & MONTAGUE, P.C.
 5    KAREN S. ORMAN
      1622 Locust Street
 6    Philadelphia, PA  19103
      Telephone:  215/875-3000
 7
      BARRACK, RODOS & BACINE
 8    EDWARD M. GERGOSIAN
      LISA C. ATKINSON
 9    600 West Broadway, Suite 1700
      San Diego, CA  92101
10    Telephone:  619/230-0800

11    BARRACK, RODOS & BACINE
      GERALD J. RODOS
12    3300 Two Commerce Square
      2001 Market Street
13    Philadelphia, PA  19103
      Telephone:  215/963-0600
14
      COHEN, MILSTEIN, HAUSFELD
15      & TOLL
      STEVEN J. TOLL
16    1100 New York Avenue, N.W.
      West Tower, Suite 500
17    Washington, DC  20005
      Telephone:  202/408-4600
18
      GOODKIND LABATON RUDOFF
19      & SUCHAROW
      MARTIS ANN BRACHTL
20    100 Park Avenue, 12th Floor
      New York, NY  10017
21    Telephone:  212/907-0700

22    LAW OFFICES OF RICHARD
        APPLEBY
23    RICHARD APPLEBY
      39 Broadway
24    New York, NY  10005
      Telephone:  212/344-1800
25
      STULL, STULL & BRODY
26    JULES BRODY
      6 East 45th Street
27    4th Floor
      New York, NY  10017
28    Telephone:  212/687-7230
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF
JEFFREY W. HERMANN
Park 80 Plaza West-One
Saddle Brook, NJ  07662
Telephone:  201/845-9600

KAPLAN, KILSHEIMER & FOX
ROBERT N. KAPLAN
685 Third Avenue, 26th Floor
New York, NY  10017
Telephone:  212/687-1980

RABIN & GARLAND
I. STEPHEN RABIN
275 Madison Avenue
New York, NY  10016
Telephone:  212/682-1818

GLASSMAN AND CLEMENS
MICHAEL S. GLASSMAN
3200 Wilshire Boulevard
14th Floor, South Tower
Los Angeles, CA  90010
Telephone:  213/389-9623

ZWERLING, SCHACHTER, ZWERLING
  & KOPPELL, LLP
ROBERT S. SCHACHTER
767 Third Avenue
New York, NY  10017-2023
Telephone:  212/223-3900

Attorneys for Plaintiffs

CPC\YDG06989.CPT

<u>DECLARATION OF SERVICE BY MAIL</u>

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested in the within action; that declarant's business address is 600 West Broadway, Suite 1800, San Diego, California  92101.

2.    That on May 5, 1995, declarant served the SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.    That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 5th day of May, 1995, at San Diego, California.

_____
YVETTE D. GRAY

```
CPC
Service List - 01/30/95
Page   1
```

COUNSEL FOR PLAINTIFF(S)

Kevin J. Yourman
Joseph D. Cohen
WEISS & YOURMAN
1800 Avenue of the Stars
Suite 1000
Los Angeles, CA  90067
  310/277-1574
  310/277-3010 (fax)

Theodore C. Skokos
SKOKOS, COLEMAN & RAINWATER,
  P.A.
425 West Capitol Avenue
3200 TCBY Tower
Little Rock, AR  72201-3439
  501/374-1107
  501/374-5092 (fax)

Mark Solomon
MILBERG WEISS BERSHAD HYNES &
  LERACH
355 South Grand Avenue
Suite 4170
Los Angeles, CA  90071
  213/617-9007
  213/617-9185 (fax)

Gerald Rodos
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
  215/963-0600
  215/963-0838 (fax)

MichaelS. Glassman
GLASSMAN AND CLEMENS
3200 Wilshire Boulevard
14th Floor, South Tower
Los Angeles, CA  90010
  213/389-9623
  213/389-8687 (fax)

Jeffrey W. Hermann
COHN LIFLAND PEARLMAN HERRMANN
  & KNOPF
Park 80 Plaza West-One
Saddle Brook, NJ  07662
  201/845-9600
  201/845-9423 (fax)

Alison M. Tattersall
MILBERG WEISS BERSHAD HYNES &
  LERACH
222 Kearny Street, 10th Floor
San Francisco, CA  94108
  415/288-4545
  415/288-4534 (fax)

Alan Schulman
Anita Meley Laing
MILBERG WEISS BERSHAD HYNES &
  LERACH
600 West Broadway, Suite 1800
San Diego, CA  92101-5050
  619/231-1058
  619/231-7423 (fax)

Jules Brody
STULL, STULL & BRODY
6 East 45th Street, 4th Floor
New York, NY  10017
  212/687-7230
  212/490-2022 (fax)

Mark C. Gardy
ABBEY & ELLIS
212 East 39th Street
New York, NY  10016
  212/889-3700
  212/684-5191 (fax)

CPC
Service List - 01/30/95
Page   2


COUNSEL FOR PLAINTIFF(S)

Steven J. Toll
COHEN, MILSTEIN, HAUSFELD &
   TOLL
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC   20005-3934
   202/408-4600
   202/408-4699 (fax)

Martis Ann Brachtl
GOODKIND LABATON RUDOFF &
   SUCHAROW
100 Park Avenue, 12th Floor
New York, NY   10017
   212/907-0700
   212/818-0477 (fax)

Karen S. Orman
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA   19103
   215/875-3000
   215/875-4604 (fax)



Joseph H. Weiss
WEISS & YOURMAN
319 Fifth Avenue
New York, NY   10016
   212/532-4171
   212/682-3010 (fax)


Jeffrey H. Squire
KAUFMAN, MALCHMAN, KIRBY &
   SQUIRE
919 Third Avenue, 11th Floor
New York, NY   10022
   212/371-6600
   212/751-2540 (fax)

Max Berger
BERNSTEIN LITOWITZ BERGER &
   GROSSMANN
1285 Avenue of the Americas
33rd Floor
New York, NY   10019
   212/554-1400
   212/554-1444 (fax)

Robert N. Kaplan
KAPLAN, KILSHEIMER & FOX
685 Third Avenue, 26th Floor
New York, NY   10017
   212/687-1980
   212/687-7714 (fax)

Michael P. Fuchs
Patricia I. Avery
Andrew Lencyk
WOLF POPPER ROSS WOLF & JONES,
   L.L.P.
845 Third Avenue
New York, NY   10022
   212/759-4600
   212/486-2093 (fax)

Robert S. Schachter
ZWERLING, SCHACHTER, ZWERLING
   & KOPPELL, LLP
767 Third Avenue
New York, NY   10017-2023
   212/223-3900
   212/371-5969 (fax)

Richard Appleby
LAW OFFICES OF RICHARD APPLEBY
39 Broadway
New York, NY   10006
   212/344-1800
   212/797-3369 (fax)

CPC
Service List - 01/30/95
Page   3


COUNSEL FOR PLAINTIFF(S)

I. Stephen Rabin
RABIN & GARLAND
275 Madison Avenue
New York, NY  10016
   212/682-1818
   212/682-1892 (fax)



COUNSEL FOR DEFENDANTS

*Jeffrey S. Benice
 William Moran
 BENICE & ASSOCIATES
 18101 Von Karman Avenue
 Suite 1940
 Irvine, CA  92715
   714/955-6500
   714/955-6522 (fax)


*Joel E. Bonner, Ass't Gen. Counsel
 ERNST & YOUNG
 515 S. Flower Street, Suite 600
 Los Angeles, CA  90071
   213/977-3486
   213/977-3541 (fax)

* Miles N. Ruthberg
  Greg Schultz
  HELLER, EHRMAN, WHITE &
   McAULIFFE
  601 S. Figueroa Street
  40th Floor
  Los Angeles, CA  90017-5758
    213/689-0200
    213/614-1868 (fax)


*  Denotes Service Via Federal Express

91